Georgia ERICKSON and Department of Administration/Bureau of Risk Management of State of Wisconsin, Plaintiffs,

v.

WISCONSIN DEPARTMENT OF CORRECTIONS, Mary Thompson, Wayne Mixdorf, Andrea Bambrough and Todd Johnson, Defendants.

No. 04–C–265–C.

United States District Court, W.D. Wisconsin.

Feb. 22, 2005.

Richard Moriarty, Assistant Attorney General, Madison, WI, for Defendants.

OPINION AND ORDER

CRABB, Chief Judge.

This is a civil action for monetary relief brought pursuant to Title VII of the Civil

Rights Act of 1964 and 42 U.S.C. § 1983. It arises out of a December 2001 incident in which plaintiff Georgia Erickson was sexually assaulted by an inmate who was working as a janitor at the Oregon Correctional Center, a facility operated by defendant Wisconsin Department of Corrections. Plaintiff contends that defendant Wisconsin Department of Corrections discriminated against her on the basis of her sex by failing to prevent the sexual assault and that individual defendants Mary Thompson, Wayne Mixdorf, Andrea Bambrough and Todd Johnson violated her substantive due process rights by knowingly and intentionally allowing the inmate access to plaintiff while she was alone and unarmed. The Department of Administration/Bureau of Risk Management of the State of Wisconsin is named as a plaintiff pursuant to its request and asserts that it may have subrogation rights in any monetary relief granted to plaintiff because she received workers' compensation benefits after the attack. (From this point on, use of the word "plaintiff" refers to Erickson unless otherwise noted.) Jurisdiction is present. 28 U.S.C. § 1331.

In an order dated September 29, 2004, I granted plaintiff leave to amend her complaint to add the § 1983 claim against the individual defendants. In that order, I noted that both sides had submitted arguments regarding the individual defendants' entitlement to qualified immunity but I declined to address that issue before the individual defendants were served with the amended complaint. Presently before the court are defendants' motion to dismiss the amended complaint and motion for summary judgment and plaintiff's motion for summary judgment regarding the subrogation claim of the state of Wisconsin. (In a stipulated settlement dated February 11, 2005, the parties informed the court that the Department of Administration has withdrawn its claim for reimbursement of worker's compensation benefits and that

plaintiff has withdrawn her motion for summary judgment regarding that claim. Therefore, I will not address any of the arguments presented with respect to that claim.)

In their motion to dismiss, the individual defendants argue that plaintiff's amended complaint shows on its face that they are entitled to qualified immunity as to plaintiff's § 1983 claim. Alternately, they argue that summary judgment based on qualified immunity is appropriate to the extent the claim survives dismissal. Defendant Wisconsin Department of Corrections takes the same in-the-alternative approach to plaintiff's Title VII claim, arguing for dismissal solely on the basis of the amended complaint and for summary judgment on the basis of the undisputed facts. Plaintiff opposes the motions to dismiss by referring to proposed facts and evidence in the record in addition to the allegations in the amended complaint. Both sides have submitted proposed findings of fact that will assist the court in analyzing the applicability of qualified immunity and the merits of plaintiff's claims. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (emphasizing importance of close analysis of factual allegations in determining whether plaintiff's claim states constitutional violation); *McMath v. City of Gary, Ind.*, 976 F.2d 1026, 1031 (7th Cir.1992); *Green v. Carlson*, 826 F.2d 647, 651 (7th Cir.1987). It makes little sense to ignore the proposed findings and confine the inquiry to the amended complaint. Therefore, I will forgo analysis of the amended complaint under Fed.R.Civ.P. 12(b)(6) and move directly to summary judgment.

The individual defendants' motion for summary judgment as to plaintiff's § 1983 claim will be granted because they are entitled to qualified immunity. Defendant Wisconsin Department of Corrections' mo-

tion for summary judgment as to plaintiff's claim under Title VII will be denied because there is evidence in the record from which a reasonable juror could conclude that defendant knew plaintiff faced an unreasonable risk of sexual harassment and failed to respond adequately.

Before turning to the facts, I note that portions of the parties' proposed findings of fact do not comply with this court's procedures regarding summary judgment. First, defendants misunderstand their need to respond to additional facts contained in plaintiff's response to defendants' proposed findings of fact. In replying to plaintiff's responses ¶¶ 7, 11, 42–44, 49, 72, 80, 81, 86–88, 115, 117, 119 and 120, defendants state that plaintiff "asserts different facts of her own . . . as to which, under the [court's] procedure, no 'answer' is contemplated." This is incorrect. The non-movant may propose findings of fact in its own set of proposed findings *and* in its responses to the movant's proposed findings of fact. Just because a proposed finding is located in the non-movant's response does not mean it will be disregarded. If the proposed fact is properly and sufficiently supported by admissible evidence and not disputed by the movant, the court will accept it as undisputed. *See Procedures to be Followed on Motions for Summary Judgment,* II.E.2 ("factual propositions made in response to the movant's proposed facts" must be supported by admissible evidence in order to be considered by court). Defendants' assertion that no answer is needed is insufficient to put the additional facts in plaintiff's responses in dispute. Second, defendant's proposed facts ¶¶ 69, 70, 87, 93, 96–98, 104–05, 111 and plaintiff's proposed facts ¶¶ 2, 3, 37 (first sentence), 44–46, 59, 64 (second sentence) are phrased in terms of what an individual testified to at a deposition or trial. This is not the correct way to introduce the individual's testimony into evidence. The fact that plaintiff or one of the individual defendants made certain statements at their depositions or a court proceeding is not material to the issues presented on summary judgment in this case. What is material is the substance of their testimony. Therefore, these proposed findings have been disregarded except to the extent that the parties agree on the accuracy of the underlying facts.

■ Several problems exist with plaintiff's proposed findings, almost all of which were challenged by defendants. For example, plaintiff cites to portions of her affidavit in support of her proposed findings of fact ¶¶ 4, 8 and 9, but her affidavit does not indicate how she has personal knowledge of these facts in her affidavit. *See* Fed.R.Civ.P. 56(e); *Procedures to be Followed on Motions for Summary Judgment,* I.C.1.e ("affidavits . . . must show that the person making the affidavit is in a position to testify about those facts"). Therefore, those proposed findings have been disregarded. In addition, certain statements in plaintiff's affidavit conflict with her deposition testimony or are at least inconsistent with it. For example, plaintiff states in her affidavit that she went to Hack's bar on December 20, 2001, and informed the individual defendants "that [inmate] Spicer was hanging around my cubicle and only acting like he was cleaning or working on his vacuum cleaner, but he clearly was not working, which alarmed me and caused me to believe he was simply loitering in the area to be near me and might be planning to sexually assault me." Erickson Aff., dkt. # 60, at ¶ 11. However, plaintiff did not state that she told defendants that she thought Spicer might be planning to sexually assault her at her deposition. Given the crucial nature of this fact, it is surprising that plaintiff did not mention it at her deposition. To the extent the affidavit conflicts with her earlier deposition testimony, the

court must disregard the statements in her affidavit because she has not provided a plausible explanation for the discrepancies between it and her deposition testimony. *Beckel v. Wal–Mart Associates, Inc.,* 301 F.3d 621, 623 (7th Cir.2002).

Further, plaintiff's proposed findings ¶¶ 6 and 7 contain statements about what she would have done had certain circumstances existed at the time of the events in this case. I have disregarded these findings because, aside from being mere speculation, the statements are not material to the issues in this case. In addition, I have disregarded plaintiff's proposed findings ¶¶ 54–56 and 70–77. Plaintiff cited as support for these findings Fitchburg Police Detective Celeste Stick's report of interviews she conducted with several witnesses. Stick's report would be inadmissible hearsay to prove the truth of the proposed findings, even if she testified as to the witnesses' statements at trial.

Finally, plaintiff's proposed findings ¶¶ 81–90 consist of opinions given by plaintiff's expert witness, Percy Pitzer. Defendants object to these proposed findings on the following grounds: (1) Pitzer's report contains no indication that he has ever had any personal experience with any facility operated by defendant Department of Corrections; (2) Pitzer lacks sufficient knowledge, skill, experience, training or education to present admissible opinions about what should have occurred at the Wisconsin Correctional Center System; (3) Pitzer's opinions are not based on technical or other specialized knowledge relevant to this case; (4) Pitzer's report does not say that he has ever testified as an expert or published in the field of corrections; (5) Pitzer's affidavit and report do not disclose any theories or techniques that he used in developing his opinions, which appear to be based on his own personal views; (6) to the extent he did use theories or techniques in forming his opinions, he gives no

indication that these theories or techniques have been tested or subject to peer review; (7) in his affidavit, Pitzer states that he holds the opinions in his report to a reasonable degree of vocational certainty; and (8) his report contains no opinions relevant to plaintiff's claims that are grounded in standards generally accepted as reliable by the relevant professional community. Pitzer's opinions add little to the analysis of plaintiff's § 1983 claim because they concern what defendants *should have done* and what they *failed to do,* not what defendants *actually did.* They are potentially relevant to this case only in relation to plaintiff's Title VII claim. However, I did not find it necessary to consider them in determining that defendant Department of Corrections is not entitled to summary judgment on this claim; therefore I will not address defendant's objections at this time. If plaintiff chooses to call Pitzer as a witness at trial, defendant is free to renew its objections in a motion in limine.

From the proposed findings and the record, I find the following to be material and undisputed.

## UNDISPUTED FACTS

### A. *Parties*

Plaintiff Georgia Erickson is an adult resident of Wisconsin currently employed as a payroll and benefits specialist at the University of Wisconsin Medical School in Madison, Wisconsin. She began working for defendant Wisconsin Department of Corrections in 1996 and served as a payroll and benefits specialist at the Wisconsin Correctional Center System from July 2001 to February 2004. The Wisconsin Correctional Center System is an arm of defendant Wisconsin Department of Corrections, which operates sixteen correctional facilities throughout Wisconsin. Its business offices are located in the same

building as the Oregon Correctional Center, a minimum security facility located in Oregon, Wisconsin. The business offices are separated from the facility. Inmates are allowed access to the offices only with special permission. At all times in 2001, plaintiff was an unarmed employee; she was not a security guard and was not expected to control inmates or to be left alone with them while at work.

Defendant Wisconsin Department of Corrections is an agency of the state of Wisconsin that operates maximum, medium and minimum security correctional facilities. At all relevant times, Oregon Correctional Center was a minimum security facility; many inmates at the facility are on work release. Defendant Mary Thompson has been warden of the Wisconsin Correctional Center System since January 2000. In December 2001, she had primary responsibility for insuring that sexual harassment did not occur at the Wisconsin Correctional Center System, including harassment of staff by inmates. Defendant Wayne Mixdorf was a sector chief at the Wisconsin Correctional Center System in December 2001. He had no supervisory authority over plaintiff. Defendant Andrea Bambrough was the human resources director and plaintiff's immediate supervisor at the Wisconsin Correctional Center System. One of her job duties involved investigating complaints of discrimination and harassment. Defendant Todd Johnson was a captain at the Oregon Correctional Center from January 2000 to August 2003.

### B. *Employee Training and Anti-Harassment Policies*

When plaintiff began working for defendant Department of Corrections in 1996, she received and reviewed a copy of the department's "Fraternization Policy," which prohibited department employees from having relationships with inmates. She signed a form indicating her awareness of the policy's contents and of her responsibility to report possible conflicts with the policy to her supervisor. In December 1997, plaintiff attended a mandatory three-day training course entitled "Security Training for Institution Non–Security Personnel." The session addressed numerous personal safety issues that could arise during the course of employment in the corrections field, including potential interactions with inmates. Those attending the course learned of strategies and procedures for dealing with inmate interaction.

Throughout December 2001, all correctional facilities operated by defendant Department of Corrections were subject to Wis. Admin. Code. ch. DOC 303, which prohibited inmates from engaging in any sexual contact including sexual intercourse and subjected inmates who engaged in sexual assault to the highest levels of discipline authorized therein. Wisconsin state inmates were notified of these rules and the consequences of violating them.

### C. *Inmate Classification Process*

At all relevant times, defendant Department of Corrections operated under a detailed inmate classification system as provided by its administrative rules, Wis. Admin. Code ch. DOC 302. The classification system is designed to determine inmate placement based on risk factors relative to staff safety and to allow for review of custody classification, program or treatment assignments and institution placement to ensure staff safety. The offense for which an inmate is incarcerated and the inmate's risk of assaultive or predatory behavior are among the factors considered to ensure proper classification. Inmates placed in minimum security facilities are determined to need only general monitoring of behavior and activities inside the institution and are allowed to work outside the confines of the institu-

tion. The potential risk of harm to administrative staff is one reason why unlimited contact between inmates and staff is not allowed at the Wisconsin Correctional Center System.

### D. John Spicer

John Spicer was an inmate at the Oregon Correctional Center who was assigned to perform janitorial duties in the facility's visiting room on November 12, 2001. He performed this work satisfactorily and without incident. On November 25, 2001, either Samuel Clemons, a correctional sergeant at Oregon Correctional Center, or another correctional sergeant assigned Spicer janitorial duties for the business offices of the Wisconsin Correctional Center System. (Clemons has more than twenty-five years experience in the corrections field. He perceived no reason to be concerned about inmates performing janitorial duties in the business offices without supervision before plaintiff was assaulted.) Cheryl Schuchardt, a program assistant and defendant Thompson's secretary, was responsible for overseeing the janitor assigned to the business offices and assigning him work. A performance evaluation placed in Spicer's file on or around December 9, 2001, indicates that he was given ratings of "Success" in terms of job performance, attitude and punctuality.

At some point in 2001, Schuchardt talked to defendant Johnson (captain, Oregon Correctional Center) about the inmate who preceded Spicer as the janitor in the business offices because she believed that inmate was too talkative and friendly with her. She told defendant Johnson that the business office staff did not want the inmate to work in the office anymore. Defendant Johnson reassigned the inmate immediately. On at least one other occasion in 2000 or 2001, after Schuchardt spoke with defendant Johnson about another inmate janitor who had been assigned to the business offices, he reassigned that inmate.

Before plaintiff was assaulted, Schuchardt had no reason to speak with defendant Johnson about Spicer's performance as the janitor.

### E. Contents of Spicer's Inmate File as of December 28, 2001

Before an inmate is assigned to perform janitorial duties in the Wisconsin Correctional Center System, either defendant Johnson, Brian Franson (the superintendent of Oregon Correctional Center) or one of the social workers reviews the Social Services sections of that inmate's file. According to defendant Johnson, nothing in Spicer's inmate file reflected any proclivities to engage in improper sexual conduct, much less sexual assault before the December 28, 2001 incident. (A Notice of Temporary Lockup, indicating that Spicer had been accused of sexual misconduct while incarcerated prior to December 28, 2001, should have been but was not in his file at the time Spicer was given janitorial duties. Defendant Johnson cannot explain the document's absence.)

A "Program Review Inmate Classification Summary" dated February 16, 2001 (approximately ten months before the assault at issue) was in Spicer's file at Oregon Correctional Center before he was assigned to perform janitorial duties in the business offices. On that form, the following appeared under the heading "Social Worker Summary and Appraisal of Program Review Request":

PRC will meet to assess Mr. Spicer's violations and program participation at ECCC. He was found guilty of 303.63 Policy and Proc., 303.m [sic] Punc. and Attendance, and 303.2 Disobeying orders and was given 10 MR extension. On 02–02–01 he punched out of work at m:30 PM [sic] and did not return to the cntr until 12:50 AM. He had 50 minutes travel time and did not have permission to deviate from his schedule. Mr. Spi-

cer is serving his first inc. for armed robbery 5 yrs. and fleeing 2 yrs.cc. Armed rob. involved him taking a lexus at gun point and failed to stop for police when they attempted to pull him over for traffic violations. He also has a stayed sentence and CS probation for burglary. This involved him breaking into a car dealer and taking a Jaguar when a drug dealer friend told him he could be paid a lot of money for this. Criminal history includes retail theft, attempt robbery, battery, and docs. Mr. Spicer transferred to FCCC on 01–0–01. He was at FCCC to complete phase 2 of the step program. Prior to FCCC he completed phase one of step. His unmet needs are AODA 3, and anger management. He could benefit from CGIP to address his poor decision making skills and cognitive distortions. He participated in work release from 01–15–01 until this violation occurred. He received a D–12 from the PC. Mr. Spicer made had no comment to make. I would recommend any northern camp noting unaccounted for time on work release, and unmet program needs.

On that same form, the following appeared under the heading "Program Review Committee Comments, Recommendations, and Decision,":

PRC notes social workers comments and concurs. Violations while in the community created a serious potential for a negative reaction by the community and can also result in FCCC ability to control its inmate population. Mr. Spicer has demonstrated that he is not responsible enough to handle being on his own in the community and complying with work release rules. He has unmet needs that could be addressed. I would recommend any northern center availabel [sic] where work release can be closly [sic] monitored. Mr. Spicer was in TLU at RCI and not available to appear at PRC.

Another "Program Review Inmate Classification Summary" dated August 14, 2001 was in Spicer's file before he sexually assaulted plaintiff. The following appeared under the heading "Social Worker Summary and Appraisal of Program Review Request":

Program Status: Ang Management– Comp w/ cont need in comm. AODA Lev 3–wait list. Voc ed req-unavailable. Work release-terminated disc.

Step Program–Step 1–completed, Step 2–disc terminated.

Conduct History: 3 minors & 1 major on 2/14/01 for viol of inst pol/proc's, punctuality/att & do's.

Parole Comm. action: subj rec a defer–8 on 7/31/01. Comments: "Not served suff. time. You are under the PMR law. Inst conduct unsat noting 1 major & 3 minors since last review. You rec a major & lost your work rel job at MMCC but kept your minimum status & are now at MCC. You must get no further C/R's & complete AODA Lev 3 if avail to reduce your risk to the comm." Scheduled Recall: Inmate is requesting TRF to a camp that has AODA Lev 3. Subj has been a MCC going on 5 months with satisfactory adjustment noting only 1 minor C/R during that time. He works in the maintenance dept as a swamper with above average work evals. Subj completed an anger mgmt class while at MCC. The parole commission has now directed him to complete an AODA Lev 3 group at OCC on 11/12/04. I recommend transfer to OCC for designated AODA programming.

On the same form, the following appeared under the heading "Program Review Committee Comments, Recommendations, and Decision":

Inmate waives appearance.

The committee recognizes the social worker's comments.

Spicer is a track 6, high in program participation, high risk rating. MR of 10/27/02.

Defer 8, PED of 5/27/02. Coments noted by S.W.

5 months of monitoring at MCC with satisfactory adjustment.

Program need for AODA Lev 3 as designated by the parole comm. A reservation has been secured at OCC for their Level 3 AODA program beginning on 11/12/04 and completing on 12/28/01. Subj is amenable to this.

We are in agreement to place Spicer on the transfer list to OCC for AODA Lev 3 programming, temp JCI for TRF purposes.

In addition to these documents, Spicer's file contained a certificate of completion dated May 22, 2001 for an anger management course at the McNaughton Correctional Center and a "Parole Planning Information Sheet" that he completed in handwriting and signed on June 20, 2001 while at the McNaughton Correctional Center. On the form, Spicer listed his employment history, personal debts and expressed his intention to obtain a college degree after being released from prison. Finally, the file contained a document dated June 25, 2001, entitled "Offender Performance Evaluation." In it, Spicer's supervisor wrote: "John's a steady worker. When he's got nothing to do, he'll pick up a broom and sweep to keep busy. I've got no complaints." In addition, the evaluation had ratings of "Always" for six of the eleven tasks for which ratings were requested and "Usually" for the other five tasks, resulting in an overall rating of "Above Average."

### F. *Events of December 20, 2001*

Before December 20, 2001, plaintiff received and reviewed a Department of Corrections policy regarding harassment in the workplace. This policy contained guidelines for identifying harassment and procedures for reporting it. Before December 20, plaintiff had never reported anything unusual to defendants Thompson, Johnson or any other manager or supervisor at the Wisconsin Correctional Center System or the Oregon Correctional Center.

That day, plaintiff reported to work around 10:00 a.m. Defendant Bambrough did not work that day but came to the office briefly and did not see plaintiff. Some of the staff had plans to gather after work at Hack's, a local bar, to celebrate the holiday season. Cheryl Schuchardt left the office shortly before 5:00 p.m.; at that point, plaintiff believed she was the only person remaining in the office. (Before December 20, plaintiff had made arrangements with her supervisors to work flexible hours to complete her work. Often, she had to work later than normal business hours to complete her work. Defendants knew and approved of this arrangement. Plaintiff was never told that she had to start at a particular time or that she would have to work with an inmate janitor by herself if she worked past 4:30 p.m.)

Shortly after Schuchardt left, plaintiff turned around in her cubicle and saw Spicer (although at that point she did not know his name) "monkeying with a vacuum cleaner." Erickson Dep., dkt. # 36, at 101. (According to plaintiff, December 20 was the first time she saw him in the office after business hours.) Before seeing him, plaintiff had not heard any noises indicating that someone other than herself was in the office. The inmate's presence made her "scared and kind of freaked" because she "had no idea whatsoever that anyone else was in there." *Id.* Plaintiff told Spicer that she had to "hurry and meet some other people," *id.* at 114, and prepared to leave by shutting off her computer and locking the file room, which took several

minutes. She walked to the exit door with Spicer, unlocked the door and let him out and then re-locked the door. By the time she left the offices and locked the door from the outside, Spicer was no longer in the area. The incident bothered plaintiff because she was alone in the offices with Spicer at a time when she thought he should not have been there and because she had not heard anything before seeing him. The incident gave her "the creeps like he was stalking [her] or he just acted like ... nothing was wrong. Like he was ... comfortable there." *Id.* at 129.

After leaving work, plaintiff drove to Hack's to join her co-workers. When she arrived, she joined defendants Thompson, Bambrough, Johnson and Mixdorf at a table. She told them that her encounter with Spicer (although she did not refer to him by name) had scared her and that she left work immediately after discovering his presence. (The parties disagree about much of this incident, such as which of the defendants were present when plaintiff talked about her encounter with Spicer, how to characterize her statements and how defendants reacted to them. Plaintiff contends that all of the individual defendants heard her complaint but defendants maintain that defendant Thompson left the table before plaintiff told her story. The parties agree, however, that defendants Bambrough, Johnson and Mixdorf remained at the table. Plaintiff states that she "complained" about the lack of security and Spicer's presence in her work area; however, defendant Bambrough interpreted plaintiff's story as a mere comment and noted that plaintiff "didn't say that she was concerned." Dep. of Andrea Bambrough, dkt. # 67, at 121. Moreover, defendants Bambrough, Johnson and Mixdorf would have expected plaintiff to follow up on her comments in some fashion if she had serious concerns about the inmate janitor. Finally, as to defendants' reactions, plaintiff contends that they looked at each other like they were "in shock" after hearing plaintiff's story and that defendant Thompson assured plaintiff that they would make sure the situation did not happen again. Defendants Bambrough, Johnson and Mixdorf remember their reactions differently. They recall defendant Johnson's telling plaintiff that if she wanted Spicer removed as the janitor, he would do it.) After relating her story, plaintiff remained at the bar for some time and did not mention the inmate janitor again. None of the defendants asked plaintiff for more details as to why she was frightened or told her to do anything further, but each had the authority to act on plaintiff's complaint.

As of December 20, 2001, defendant Johnson knew that Spicer was the inmate janitor assigned to the business offices. However, before hearing plaintiff's story, he was not aware of any difficulties or concerns about Spicer.

### G. *Subsequent Events*

Plaintiff was not at work from December 21–26, 2001. She worked all day on Thursday, December 27 and Friday, December 28 but did not communicate with any of the individual defendants about her concerns with the inmate janitor. (According to plaintiff, she did not raise the subject of the inmate janitor with defendants after December 20 because she was informed at the bar that the situation would not be allowed to happen again.) Spicer's time sheet for December 2001 indicates that he worked 10.5 hours on both December 27 and 28.

Defendant Bambrough was not at work the entire week starting on Monday, December 24 except for a brief period on December 27 during which she had no contact with plaintiff; however, on occasions prior to December 28, 2001, plaintiff had contacted defendant Bambrough from home either through plaintiff's home email

account or by leaving messages through other means. Defendant Johnson worked from 7:00 a.m. to 4:00 p.m. on December 21 and 26–28. The subject of Spicer was not brought to his attention on any of those days until late in the evening on December 28, after Spicer escaped from Oregon Correctional Center. Defendant Mixdorf was scheduled to work Friday, December 21 and the non-holiday days of the next week; the topic of office safety did not arise with him from December 21 through the end of the business day on Friday, December 28. (Before December 28, 2001, defendant Mixdorf had no personal knowledge regarding Spicer; he learned Spicer's name for the first time after plaintiff was assaulted.)

On December 28, plaintiff worked from 8:00 a.m. to 5:30 p.m. without a lunch break. She worked more than eight hours that day because of her work load. Around 4:30 p.m., defendant Mixdorf sent an email to defendant Thompson about several matters that had arisen over the course of the week. The email did not mention any issue related to office safety. After sending the email, defendant Mixdorf went to the cubicles of plaintiff and Schuchardt to wish them a happy new year and to be sure that neither would be left alone when he left. It was the practice in the business offices for the next to last person out of the offices to lock the door. Defendant Mixdorf left the office around 4:45 p.m. Several minutes later, while plaintiff worked at her desk, Spicer approached her from behind, put a knife to her throat, took her car keys and forced her into a restroom on another floor where he repeatedly sexually assaulted her and threatened her life.

Before Spicer's assault on plaintiff, no one employed at the Wisconsin Correctional Center System or the Oregon Correctional Center other than plaintiff expressed any security concerns about him

to any supervisor employed at either location. In addition, Spicer had never been charged with or convicted of any sexually-related offense and had never been found to have committed any sexually-related conduct contrary to any statute or regulation while in the custody of defendant Department of Corrections.

## DISCUSSION

### A. *Standard of Review*

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *O'Neal v. City of Chicago*, 392 F.3d 909, 910 (7th Cir.2004). In ruling on a motion for summary judgment, the court must construe the evidence, resolve factual disputes and draw inferences in the light most favorable to the non-movant. *Loeb Industries, Inc. v. Sumitomo Corp.*, 306 F.3d 469, 480 (7th Cir.2002). If the non-moving party fails to make a sufficient showing on an essential element of her case, the moving party is entitled to judgment as a matter of law. *Lewis v. Holsum of Fort Wayne, Inc.*, 278 F.3d 706, 709 (7th Cir.2002).

### B. *42 U.S.C. § 1983*

1. *State-created danger*

■ Plaintiff alleges a violation of her substantive due process rights under the state-created danger theory of liability. This theory grew out of dicta in *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), a case in which the Supreme Court held that the due process clause of the Fourteenth Amendment does not impose on state actors a duty to protect citizens from private violence. In discussing why the due process clause did not compel child welfare officials to protect a child from his father, whom the officials

had reason to believe was physically abusive, the Court noted that "[w]hile the State may have been aware of the dangers that [the child] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." The Court of Appeals for the Seventh Circuit relied on this passage in ruling that state officials may be held liable when they affirmatively place an individual in a position of danger the individual would not otherwise have faced. *Reed v. Gardner*, 986 F.2d 1122, 1125 (7th Cir.1993). In this case, plaintiff contends that the individual defendants violated her substantive due process rights, and therefore § 1983, because they placed her in a dangerous position she otherwise would not have faced. Specifically, by giving the janitor's job to Spicer, plaintiff contends defendants allowed him to have access to plaintiff's work area after normal business hours when she was alone. Defendants argue that summary judgment on plaintiff's § 1983 claim is appropriate because they are entitled to qualified immunity.

### 2. Qualified immunity

The doctrine of qualified immunity provides that public officials may not be held personally liable for performing discretionary functions as long as " 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Behrens v. Pelletier*, 516 U.S. 299, 305, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "The inquiry focuses on the objective legal reasonableness of the action, not the state of mind or good faith of the officials in question." *Erwin v. Daley*, 92 F.3d 521, 525 (7th Cir.1996) (citing *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Once a defendant raises qualified immunity as a defense, the plaintiff bears the burden of

proof. *Erwin*, 92 F.3d at 525. The plaintiff must show that the record supports a finding of unconstitutional conduct and that the applicable constitutional standards were clearly established at the time in question. *Newsome v. McCabe*, 319 F.3d 301, 303 (7th Cir.2003); *Magdziak v. Byrd*, 96 F.3d 1045, 1047 (7th Cir.1996).

With respect to the first requirement, if the plaintiff's complaint of unconstitutional conduct is legally sound but there is a material dispute about the strength of the evidence, then the case must be tried and the jury's resolution is conclusive. *Newsome*, 319 F.3d at 304. However, if the facts have not been called into question, then as to the second requirement, the appropriate inquiry is "whether reasonable public officials in their position would have understood that what they were doing was unlawful." *Kerr v. Farrey*, 95 F.3d 472, 480 (7th Cir.1996) (citing *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034). A plaintiff can establish this by citing a closely analogous case that has established both the right at issue and its application to the factual situation at hand or by showing that the violation was so obvious that reasonable persons would have been on notice that they were violating plaintiff's statutory or constitutional rights. *Erwin*, 92 F.3d at 525. In the end, summary judgment based on qualified immunity is appropriate if the law did not put defendants on notice that their conduct was clearly unlawful. *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

Plaintiff argues initially that defendants failed to properly raise the defense of qualified immunity because they did not prove that they were acting within their discretionary authority at the relevant times in this case. For support, she cites *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir.2003) in which the court stated

that "[t]o receive qualified immunity, the government official must first prove that he was acting within his discretionary authority." In most cases, whether a public official acted within his discretionary authority is not a contested issue; thus, there is little discussion in case law regarding an official's initial burden with respect to qualified immunity. Although *Gonzalez* may be read to assign the initial burden of proof to the official, the question whether the defendants in this case have met it is moot because plaintiff's theory of liability is that the individual defendants "knowingly assigned and authorized" Spicer to be the janitor, Plt.'s Br., dkt. # 56, at 39; without question, acts of assignment and authorization are discretionary in nature. Moreover, plaintiff concedes that the individual defendants acted at all relevant times within the scope of their employment and under color of state law. *Id.* at 37. More to the point, defendants' clear invocation of the qualified immunity defense is sufficient to satisfy their burden to *raise* it and shift the burden to plaintiff to satisfy the two-part test. *Campbell v. Peters,* 256 F.3d 695, 699 (7th Cir.2001) ("In general, once the defendants raise the qualified immunity defense, plaintiff must show two things: . . ."). Plaintiff cannot claim she lacked notice that defendants would raise qualified immunity as a defense because both sides briefed the issue in an earlier motion to dismiss and defendants raised it in their opening brief in support of the present motions for dismissal and summary judgment. Therefore, I will move to the first part of the test for qualified immunity.

The first inquiry a court must make when considering the applicability of qualified immunity is whether the plaintiff has shown that the defendant's conduct violated a constitutional right, when the facts are viewed in the light most favorable to the party asserting the injury. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. Before discussing the standard for liability under the state-created danger theory, I note that plaintiff has failed to pinpoint the specific actions the individual defendants took that exposed her to danger. At various points in her brief, she states that they "allowed a 'high risk' inmate, with a known violent criminal history, to have access to [her] . . . while she was alone and after hours, and failed to take any measures to prevent [Spicer]'s attack"; that they "placed her in serious harm's path"; that they "knowingly assigned and authorized [ ] Spicer to Georgia Erickson's office area after December 20, 2001" and "failed to take any measures to prevent" the attack, even after plaintiff expressed her concerns about being alone with an inmate. Plt.'s Br., dkt. # 56, at 38–40. However, plaintiff has failed to support these contentions with evidence that the individual defendants assigned Spicer to the business offices or that their authorization was needed for that assignment. Further, plaintiff's argument that the individual defendants failed to prevent the attack is irrelevant to the state-created danger theory.

In her brief, plaintiff acknowledges that liability under the state-created danger theory attaches only if she proves that the individual defendants "knowingly and affirmatively" created or exacerbated a dangerous situation. *Reed,* 986 F.2d at 1125 ("It was the police *action* in removing [the driver], combined with their *knowledge* of [the passenger]'s intoxication, which creates their liability for the subsequent incident") (emphasis added); *see also Kallstrom v. City of Columbus,* 136 F.3d 1055, 1066 (6th Cir.1998) ("Liability under the state-created-danger theory is predicated upon affirmative acts by the state which either create or increase the risk that an individual will be exposed to private acts of violence."). As I made

clear in the September 29, 2004 order, mere inaction by state officials, *even in the face of a known threat,* is insufficient. *De-Shaney,* 489 U.S. at 203, 109 S.Ct. 998; *Windle v. City of Marion,* 321 F.3d 658, 661–62 (7th Cir.2003); *Doe v. City of Marion,* 196 F.Supp.2d 750, 756–57 (N.D.Ind. 2002).

■ Plaintiff has failed to show any affirmative action taken by the individual defendants before or after December 20, 2001 that created or enhanced the danger presented by Spicer. As for events before December 20, plaintiff has adduced no evidence indicating that defendants Mixdorf, Bambrough or Thompson were involved in the decisions to make Spicer an inmate janitor or to assign him to the Wisconsin Correctional Center System's business offices. (In fact, defendant Mixdorf had no personal knowledge of Spicer before he assaulted plaintiff and escaped from the Oregon Correctional Center on December 28.) This fact distinguishes the present case from *L.W. v. Grubbs,* 974 F.2d 119 (9th Cir.1992), where the defendants selected a known sex offender to work with a prison nurse. Admittedly, defendant Johnson was one of several individuals who may have reviewed Spicer's file before he was assigned janitorial duties. However, the undisputed facts show that a correctional sergeant at the Oregon Correctional Center (possibly Samuel Clemons) assigned Spicer to the Wisconsin Correctional Center System's business offices.

After December 20, none of the individual defendants took any action with respect to plaintiff's complaint. *Windle,* 321 F.3d at 661–62 (choosing to stand idle or not take action do not constitute affirmative acts); *Stevens v. Umsted,* 131 F.3d 697, 705 (7th Cir.1997) ("Stevens's complaint is phrased entirely in terms of Umsted's failure to act, and thus, does not allege an affirmative act by the state."). In fact, the subject of the inmate janitor was not brought to their attention again until after the assault.

The only occurrence that could possibly be construed as an affirmative act occurred at Hack's on December 20. Plaintiff asserts that after she told defendants that she had been left alone with Spicer, defendant Thompson assured her that the situation would not happen again. For the purpose of resolving defendants' motion for summary judgment, I accept her assertion as true. In *Monfils v. Taylor,* 165 F.3d 511 (7th Cir.1999), the court denied qualified immunity to a deputy police chief who failed to prevent the release of a tape recording of Monfils notifying police of a co-worker's intent to steal office equipment after assuring him that he would not release the tape. After the tape was released, the co-worker murdered Monfils and his survivors filed suit under the state-created danger theory. The court ruled that the police chief created a danger that Monfils would not have otherwise faced by assuring him and an assistant district attorney that the tape would not be released and then failing to comply with his assurances. *Id.* at 518.

*Monfils* is distinguishable from the present case. At the time the police chief assured Monfils that the tape would not be released, the co-worker did not have a copy of the tape. By failing to ensure that the tape was not released, the defendant exposed Monfils to a danger he would not otherwise have faced. In this case, defendant Thompson allegedly assured plaintiff that she would not be left alone with Spicer *again.* Spicer had been assigned to the business offices where plaintiff worked on November 25, 2001, a month before defendant Thompson spoke to plaintiff. This point is crucial because, even though defendant Thompson did not follow through on her assurance, her comment did not cause or enhance a danger plaintiff

would not otherwise have faced. A different case would be presented if plaintiff had expressed her concerns about Spicer before he had been assigned to the business offices and defendant Thompson had assured her that Spicer would be kept away from her and then failed to prevent the assignment.

The undisputed facts do not show that the individual defendants violated plaintiff's constitutional rights. She has not shown that any defendant acted knowingly to create or enhance a danger she otherwise would not have faced. There is no evidence that any of the defendants assigned Spicer to clean the business offices, much less that they did so knowing that he would be alone with plaintiff and that he posed a risk of harm to her. Plaintiff's vague allegations that the defendants "allowed" Spicer access to plaintiff were barely enough to survive a motion to dismiss; on summary judgment, they are wholly insufficient. The lack of affirmative action by defendants makes this case analogous to *DeShaney*, 489 U.S. at 203, 109 S.Ct. 998, because "the most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them." The individual defendants are entitled to qualified immunity as to plaintiff's § 1983 claim for monetary damages. Their motion for summary judgment as to the § 1983 claim will be granted.

### C. *Title VII*

■ Section 703(a) of Title VII prohibits an employer from discriminating against an employee on the basis of sex. 42 U.S.C. § 2000e–2(a)(1). Courts have long recognized that employers may be responsible for sexual harassment in the workplace under Title VII. *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 751–55, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). To survive summary judgment on a claim of sexual harassment based on a hostile work environment, a plaintiff must present evidence from which a jury could conclude that she was subjected to unwelcome sexual conduct, advances or requests because of her sex that were severe or pervasive enough to create a hostile work environment and that there is a basis for employer liability. *Rhodes v. Illinois Dept. of Transportation*, 359 F.3d 498, 505 (7th Cir.2004); *Smith v. Sheahan*, 189 F.3d 529, 532–33 (7th Cir.1999). Defendant Department of Corrections does not dispute the fact that Spicer repeatedly sexually assaulted plaintiff on December 28, 2001, and it does not argue that this conduct did not constitute unwelcome sexual conduct directed at plaintiff because of her sex that created a hostile work environment. *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 807 (7th Cir.2000) (quoting *Baskerville v. Culligan International Co.*, 50 F.3d 428, 430–31 (7th Cir.1995) (sexual assault creates objectively hostile work environment)). (For Title VII purposes, the Department of Corrections is the only defendant. All further references to defendant are to the department.)

■ Defendant argues that it is entitled to summary judgment because there is no basis for employer liability. Under Title VII, an employer's liability is determined by the status of the harasser and the type of injury caused by the harassment. *Ellerth*, 524 U.S. at 759, 118 S.Ct. 2257. If the harasser is the plaintiff's superior, the employer is vicariously liable; the employer may avoid liability only if the plaintiff did not suffer a tangible job detriment and it can prove both that it exercised reasonable care to correct and prevent the harassment and that the plaintiff unreasonably failed to take advantage of the employer's corrective or preventive opportunities. *Id.* at 765, 118 S.Ct. 2257. For co-worker harassment, the standard of

liability for the employer is negligence. *Id.* at 758–59, 118 S.Ct. 2257 (quoting *Restatement of Agency* § 219(2)); *Williams v. Waste Management of Illinois Inc.*, 361 F.3d 1021 (7th Cir.2004).

This case does not fit neatly into the supervisor or co-worker categories, however. Clearly, Spicer was not plaintiff's supervisor. Less clear is whether he was plaintiff's co-worker (or defendant's employee). Defendant argues that he was not an employee and cites several cases in which courts held that inmates performing prison labor who sued corrections officials under Title VII or the Fair Labor Standards Act were not entitled to the protections of those statutes. *E.g., Bennett v. Frank*, 395 F.3d 409 (7th Cir.2005); *Williams v. Meese*, 926 F.2d 994 (10th Cir.1991); *McCaslin v. Cornhusker State Industries*, 952 F.Supp. 652 (D.Neb.1996); *George v. Badger State Industries (BSI)*, 827 F.Supp. 584 (W.D.Wis.1993). These decisions were based in part on the conclusion that the relationship between an inmate and a prison "is not voluntary; ... It is not one of employer-employee. Instead, it is one of jailor-jailed." *McCaslin*, 952 F.Supp. at 657; *see also Williams*, 926 F.2d at 997 ("although [an inmate's] relationship with [prison officials] may contain some elements commonly present in an employment relationship, it arises from [the inmate's] having been convicted and sentenced to imprisonment in the [ ] correctional institution. The primary purpose of their association is incarceration, not employment."). These cases have limited relevance to the question presented here because this case does not involve an inmate seeking to hold corrections officials accountable for discriminatory employment practices. Instead, the question is whether the Department of Corrections should be held accountable for its failure to prevent an inmate over which it exercised complete control from sexually assaulting her. *See Rowinsky v. Bryan Independent School Dist.*, 80 F.3d 1006, 1020 (5th Cir. 1996) (Dennis, J., dissenting) ("employer liability for hostile environment harassment by co-workers and non-employees under Title VII is predicated on the *employer's failure* to act in accordance with its statutory duty") (emphasis in original). Whether an inmate performing prison labor is entitled to the protections of Title VII and whether defendant Department of Corrections can be held liable for an inmate's sexual harassment of its employee are separate and distinct inquiries.

Plaintiff argues that Spicer should be considered defendant's employee under the multi-factor test for distinguishing employees from independent contractors set forth in *Worth v. Tyer*, 276 F.3d 249, 263 (7th Cir.2001). That test places primary emphasis on "the employer's right to control the worker's actions." *Id.* Alternately, plaintiff argues that the nature of the relationship between Spicer and defendant is irrelevant because employers can be held liable under Title VII for workplace sexual harassment perpetrated by non-employees. Because I agree with plaintiff's second argument, I conclude it is unnecessary to characterize Spicer's relationship with defendant.

1. *Employer liability for non-employee harassment*

█ In *Berry v. Delta Airlines, Inc.*, 260 F.3d 803 (7th Cir.2001), an airline customer service agent sued her employer under Title VII for failing to remedy a hostile work environment created by an employee of the company that the airline had contracted to provide baggage handling services. In discussing the airline's liability, the court noted that employers are liable for "co-worker on co-worker harassment" if they know or should know about it and fail to take appropriate remedial action. *Id.* at 811. The court also

cited an EEOC regulation that extends this "knew or should have known" standard to harassment by non-employees:

> An employer may also be responsible for the acts of non-employees, with respect to sexual harassment in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action.

29 C.F.R. § 1604.11(e) (1997). The court declined to adopt or reject the EEOC standard but expressed some doubt regarding the extension of employer liability to the acts of an independent contractors' employees in light of the Supreme Court's reliance on agency principles as a basis for holding employers liable for harassment in *Ellerth* and *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). *Berry,* 260 F.3d at 812 ("an employee of an independent contractor typically cannot be considered an agent of the employer"); *but see Jarman v. City of Northlake,* 950 F.Supp. 1375, 1378 n. 5 (N.D.Ill.1997) (no tension between EEOC guideline and agency principles because *Restatement (Second) of Agency* § 213(d) provides that a person "is subject to liability for harm resulting from his conduct if he is negligent or reckless in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control.").

The discussion in *Berry* is the closest the Court of Appeals for the Seventh Circuit has come to squarely addressing an employer's liability for non-employee harassment. However, other federal appellate and district courts have held that employers can be held liable for non-employee harassment that occurs in the workplace. *E.g., Slayton v. Ohio Dept. of Youth Services,* 206 F.3d 669 (6th Cir.2000) (prison liable for inmate conduct creating

hostile environment where corrections official instigated behavior); *Zupan v. State of Illinois,* No. 95 C 1302, 1999 WL 281344 (N.D.Ill. Mar.30, 1999) (state and circuit court could be liable for harassment of probation officer by deputy sheriff); *Jarman,* 950 F.Supp. at 1378–79 (applying EEOC guideline and concluding that city could be liable for alderman's harassment of deputy clerk); *Powell v. Las Vegas Hilton Corp.,* 841 F.Supp. 1024 (D.Nev. 1992) (denying summary judgment because casino could be liable for harassment of dealer by gamblers); *Magnuson v. Peak Technical Services, Inc.,* 808 F.Supp. 500 (E.D.Va.1992). In *Lockard v. Pizza Hut, Inc.,* 162 F.3d 1062 (10th Cir.1998), a waitress sued her employer after being sexually harassed by a customer. The court held that the employer could be liable for customer harassment under a negligence theory, noting that "[t]he focus of the inquiry in a hostile work environment claim, as the name suggests, is on whether the workplace is permeated with discriminatory intimidation, ridicule, and insult." *Id.* at 1073 (internal citations and quotations omitted). A non-employee can create this environment as easily as an employee. *Henson v. City of Dundee,* 682 F.2d 897, 910 (11th Cir.1982); *see generally* Robert J. Aalberts & Lorne H. Seidman, *Sexual Harassment of Employees by Non–Employees: When Does the Employer Become Liable?,* 21 Pepp. L.Rev. 447 (1994).

Two cases involving sexual harassment by individuals detained in treatment facilities provide further support for plaintiff's position. In *Crist v. Focus Homes, Inc.,* 122 F.3d 1107 (8th Cir.1997), three employees at a private residential facility for autistic individuals sued their employer for failing to properly respond after a patient repeatedly assaulted them. The court reversed a grant of summary judgment for the defendant, holding that factual issues remained as to the appropriateness of the

facility's response to the plaintiffs' complaints. Instead of the patient's status as a non-employee, the court focused on the defendant's ability to control the environment in which the alleged harassment occurred, noting that "Focus Homes clearly controlled the environment in which [the patient] resided, and it had the ability to alter those conditions to a substantial degree." *Id.* at 1112. In *Turnbull v. Topeka State Hospital,* 255 F.3d 1238 (10th Cir. 2001), a psychologist at a state mental hospital sued the hospital for sexual harassment after being sexually assaulted by a patient. The court cited *Lockard* and *Crist* and emphasized the employer's control over the work environment as a basis for liability. *Id.* at 1244.

Relying on this line of authority and the lack of any clear statement to the contrary by the Court of Appeals for the Seventh Circuit, I conclude that defendant's liability for failing to prevent plaintiff from being sexually harassed should be governed by the negligence standard applicable in cases of co-worker harassment. Spicer's status as an inmate janitor makes him appear more like an employee than an independent contractor or other third party over which defendant exercised little or no control. In addition, defendant controlled the conditions of the working environment at the Wisconsin Correctional Center System and exercised more control over Spicer than its regular employees. *Lockard,* 162 F.3d at 1074. The extent of defendant's control over Spicer makes it appropriate to hold defendant accountable for its negligence in failing to prevent the harassment. Indeed, given Title VII's broad, remedial goal of ending workplace discrimination in all its forms, *Veprinsky v. Fluor Daniel, Inc.,* 87 F.3d 881, 888 (7th Cir.1996), the statute's intent would be frustrated if defendant could avoid liability simply because Spicer was an inmate first and an employee second. The focus in a "failure to prevent" situation like the pres-

ent case should be on the employer's knowledge of the harassment, the employer's ability to end or prevent it and the " 'adequacy of the employer's remedial and preventative responses.'" *Turnbull,* 255 F.3d at 1244 (quoting *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 673 (10th Cir. 1998)).

### 2. *Notice and response*

Defendant argues that liability for failure to prevent harassment attaches only after an employer receives notice that such harassment is occurring, *Parkins v. Civil Constructors of Illinois,* 163 F.3d 1027, 1035 (7th Cir.1998), and that notice must be sufficient to alert a reasonable employer that there is some probability that the employee is being harassed. *Durkin v. City of Chicago,* 341 F.3d 606, 612 (7th Cir.2003). Defendant contends that it did not have notice of any ongoing harassment because Spicer did not engage in any conduct that can reasonably be construed as sexual harassment before assaulting plaintiff on December 28, 2001, and plaintiff's December 20, 2001 complaint was insufficient notice because plaintiff expressed concerns relating to security and personal safety, not improper sexual conduct. *Cooper–Schut v. Visteon Automotive Systems,* 361 F.3d 421, 426–27 (7th Cir.2004).

In an order dated July 19, 2004, I rejected defendant's argument that Title VII requires that sexual harassment be pre-existing before an employer may be held liable. In discussing an employer's duty to prevent harassment, I noted that

> most of the cases dealing with Title VII hostile work environment claims focus solely on the remedial efforts of an employer after acquiring notice of sexual harassment. *See e.g., Shaw v. AutoZone, Inc.,* 180 F.3d 806 (7th Cir.1999); *Rhodes v. Illinois Dept. of Transportation,* 359 F.3d 498 (7th Cir.2004). How-

ever, the likely reason for this emphasis is not that employers have no duty to prevent harassment, but that, ordinarily, employers will not be aware of facts demonstrating an unreasonable risk that sexual harassment will occur.

In this case, however, the harasser is a prisoner and the employer is the Department of Corrections. In such a case, it is more likely that the employer will be aware of facts demonstrating that there would be an unreasonable risk of sexual harassment if the prisoner was left alone with a "co-worker," both because prisoners as a group tend to be more dangerous than employees in other settings and because defendant would know much more about the prisoner's propensity to commit sexual assault than other employees would.

Order, dkt. # 18, at 9–10. Because Title VII's primary objective is the avoidance of unlawful discrimination, I concluded that, even if there are no prior incidents of sexual harassment, an employer can be liable for failing to prevent a sexually hostile work environment if it knew there was an unreasonable risk that one would occur. This conclusion focuses the court's inquiry on what defendants knew and how they responded, whether by action or inaction. Taking into account plaintiff's version of her December 20, 2001 complaint, which I must accept as true in resolving this motion, and defendant Johnson's knowledge of Spicer at the time of the complaint, I find that there is evidence from which a reasonable jury could conclude that defendant Department of Corrections knew that plaintiff faced an unreasonable risk of sexual harassment and failed to take adequate action in response.

Before Spicer attacked plaintiff, his file at the Oregon Correctional Center contained documents detailing (1) a violent criminal history, including incidents of armed robbery, fleeing from the police, burglary, retail theft, attempted robbery and battery; (2) the revocation of his work release after he failed to return to prison on time; and (3) his designation as a "high risk" inmate four months before the attack. Although defendant Johnson believes that nothing in the file indicates directly that Spicer posed a risk of sexual assault to females, sexual assault is a crime of violence. A jury could reasonably disagree with defendant Johnson's assessment. Defendant Johnson was one of three individuals who might have reviewed Spicer's file before he was given the janitor's job; for the purpose of summary judgment (and for that purpose only), I infer that he conducted the review and can be charged with knowledge of the file's contents.

In addition, a week before the assault, the individual defendants learned that plaintiff had been left alone and unarmed with an inmate in the business offices after normal business hours and that his presence had frightened her and prompted her to leave work immediately. According to plaintiff, the individual defendants reacted to her story by looking at each other as if they were "in shock" and defendant Thompson assured her that the situation would not happen again. Moreover, there is evidence that defendant Johnson had relieved inmates of janitorial responsibilities in the business offices on two prior occasions. On one of these occasions, the inmate was removed after Cheryl Schuchardt told defendant Johnson that the inmate was too friendly with her. A reasonable jury could conclude that defendants' reactions to plaintiff's story indicate that they knew that plaintiff had been left in an unreasonably risky situation. From defendant Johnson's prior removal of two inmate janitors and his knowledge of the contents of Spicer's inmate file, a jury could conclude that he possessed a heightened and more particularized sensitivity to the risk that Spicer would sexually harass

plaintiff if he was alone with her in the future.

Finally, a jury could conclude that the response to plaintiff's complaint was inadequate. As previously noted, inaction best summarizes the individual defendants' response. Although inaction is irrelevant in the context of plaintiff's § 1983 claim, it is relevant to the adequacy of the employer's response to a risk of harassment under Title VII. In this case, none of the individual defendants followed up on the concerns plaintiff raised on December 20 despite the fact that they may have known that plaintiff often worked later than normal business hours to complete her work and therefore might be left alone with the inmate janitor again. Admittedly, plaintiff did not mention the inmate janitor again at the bar or at any time the following week; however, a jury could believe plaintiff's contention that she did not raise the issue with defendants because defendant Thompson told her that she would not be left alone with the janitor. Given this assurance, the complete absence of further inquiry or action on the part of the individual defendants is puzzling. In any event, deciding which side to believe is the province of the jury. Because there is evidence from which a reasonable jury could conclude that defendant Department of Corrections knew that plaintiff faced an unreasonable risk of sexual harassment and failed to respond adequately, defendant's motion for summary judgment must be denied.

## ORDER

IT IS ORDERED that the motion for summary judgment filed by defendants Mary Thompson, Wayne Mixdorf, Andrea Bambrough and Todd Johnson as to plaintiff Georgia Erickson's claim under 42 U.S.C. § 1983 is GRANTED. Defendants Thompson, Mixdorf, Bambrough and Johnson are DISMISSED as defendants from this case. FURTHER, IT IS ORDERED that defendant Wisconsin Department of Corrections' motion for summary judgment as to plaintiff's claim under Title VII is DENIED. Plaintiff's motion for summary judgment regarding the state's subrogation claim is DENIED as moot, by virtue of the parties' settlement.