In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3631

Elise N. Berry,

Plaintiff-Appellant,

v.

Delta Airlines, Incorporated,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 5770--James B. Zagel, Judge.

Argued April 2, 2001--Decided August 14, 2001


   Before Bauer, Cudahy, and Easterbrook,
Circuit Judges.

   Bauer, Circuit Judge.  Elise Berry
appeals the district court's grant of
summary judgment in favor of Delta
Airlines on her Title VII claim of sexual
harassment. We affirm.

BACKGROUND

   Berry was employed as customer service
agent at Delta's cargo facilities at
O'Hare Airport in Chicago. Her job
sometimes required her to enter the
warehouse portion of Delta's cargo
building and to work with employees of
Argenbright Security ("Argenbright"), a
company which Delta had contracted to
provide baggage handling services. Fikret
Causevic worked for Argenbright at the
Delta cargo facilities as a warehouse
supervisor.

   On July 7, 1999, Berry met with Roger
Blocker, a Delta regional manager, and
complained that Causevic had been
sexually harassing her both verbally and
physically for over eight months. Berry
provided Blocker with a litany of
examples, including claims that Causevic
slid his hand up her shorts to her panty
line and told her that he loved her
smooth legs, pulled her blouse away from
her chest and tried to look down her
shirt at her breasts, repeatedly asked

her if she would take him up on his "proposition" (for sex) and if she would go with him on a "very, very long ride home," referred to her as his "girlfriend" in front of others, asked her on a date, told her he thought her "butt" and legs were "sexy," and tried to touch or embrace her inappropriately on various occasions. In addition, Berry claimed that, beginning in April, 1999, every time she called or visited the warehouse seeking work-related assistance from Causevic, he would answer her requests with cheeky comments such as "give me a kiss first," "what will you do for me," or "only if you go on a long ride with me."

Blocker immediately began to investigate Berry's complaint./1 On the very day that Berry complained about Causevic, Blocker contacted Delta's Equal Opportunity ("EO") Office at Delta's Atlanta headquarters to request guidance on how to handle Berry's complaint. Pursuant to directions from the EO office, Blocker met with Berry again that day to tell her that he intended to investigate her complaint. He asked Berry what she thought he should do about the situation. Berry told him that she only wanted Causevic to stop harassing her and to be kept away from her, and that she did not want to get him fired. Berry also opined that the Argenbright employees needed better training regarding appropriate behavior in the workplace, and that they should be disciplined when they acted inappropriately. During one of their meetings, Berry mentioned to Blocker that Illiana Torres, a friend and co-worker of Berry's, was present during one of the harassing episodes and might be able to corroborate Berry's complaint regarding that incident. Blocker asked Berry to submit a written statement detailing her complaints concerning Causevic.
The next day, after receiving Berry's written statement, Blocker reported the matter to Causevic's supervisor, Rodney Drake. Blocker and Drake then immediately confronted Causevic with Berry's allegations. After Causevic denied everything, Drake and Blocker instructed him to put his response in writing. Shortly thereafter, Berry met with Blocker again to report an additional incident of harassment which she claimed to have been too embarrassed to mention

during their previous meetings. Specifically, Berry claimed that in April of 1999, while she was lifting the back of her shirt to show some of the warehouse employees the sunburn that she had acquired on a recent vacation, Causevic approached her from behind, put his arm around Berry's waist and tried to touch her breasts. Berry told Blocker that Jaron Ketchum, another Argenbright employee, had witnessed the event.

   Blocker promptly began interviewing potential witnesses to the claimed harassment. He first spoke with Torres, who said that on one occasion she overheard Causevic ask Berry if she had thought about his "proposition," to which Berry responded "no." Torres stated that Causevic then said that he was "serious," and that Berry again told him "no" and asked her to leave her alone. Blocker asked Torres to me-morialize this in a written statement, which she did. Torres did not confirm any other claims made by Berry. Moreover, shortly after hearing Berry's additional complaint con-cerning the sunburn incident, Blocker informed Drake of the new allegation and asked him to get a statement from Ketchum regarding the incident. Upon Drake's request, Ketchum provided a written statement which neither corroborated nor contradicted Berry's account of the incident (it merely stated that he wanted to be "left out of the situation" for "personal reasons."). Blocker then spoke with Ketchum in person and asked him if he has witnessed the sunburn incident, but Ketchum repeated that he did not want to get involved. Undaunted, Blocker met with Ketchum a second time on or about June 11, 1999, which was Ketchum's last day of work. Ketchum again refused toprovide a written statement, preferring to stay out of the situation. However, this time Blocker then asked Ketchum to tell him "off the record" if he could confirm any of Berry's claims. The parties dispute what Ketchum said in response. Berry points to Ketchum's deposition, wherein Ketchum asserts that he told Blocker that he saw Causevic make "flirtatious remarks" to Berry and, during the sunburn incident, hug her around the stomach from behind and touch her leg below the knee. Delta relies on Blocker's deposition, wherein Blocker claims that while Ketchum gave him the impression that he might have seen

something, he refused to give any details of what he might have seen. Blocker also testified that Ketchum expressly denied ever seeing Causevic grab Berry from behind around her breasts. Blocker also interviewed other Delta agents who worked with Berry. Two of the agents repeated concerns that they had expressed to Blocker earlier about Argenbright employees using offensive profanity in the warehouse, but none of them confirmed any of Berry's allegations, and some of them said that they had never seen Causevic do or say anything of a sexually inappropriate nature.

On June 18, 1999, Blocker informed Berry that he was unable to confirm that her allegations were true. However, Delta management did take some corrective measures shortly after Blocker concluded his investigation. Around June 21, 1999, Delta management set up a sexual harassment video in the back customer service area and directed all Delta employees to watch the video on their free time and to sign a log indicating that they had done so. The vid-eo was one that Delta employees were required to watch every year. Upon Blocker's request, Drake required all Argenbright employees to watch the video as well. However, Blocker did not discussed the content of the video with any of the employees. Moreover, some time around July 3, 1999, Blocker asked Drake to change Causevic's shift to elimin-ate or significantly reduce interaction between Causevic and Berry. Drake complied, and Causevic was moved to a day shift. While he suspected that Berry's complaint was the reason for his shift change, Causevic was never told this, nor was he ever told to keep away from Berry or reprimanded for any of his alleged improprieties. After the shift change, Berry's and Causevic's shifts overlapped for approximately one and one-half hours each day, and she continued to have contact with him on several occasions during those times.

After she complained to Blocker about Causevic, Berry experienced what she characterizes as continuing campaign of sexual harassment perpetrated by Causevic and other Argenbright employees. For example, while Berry was watching the sexual harassment video in the presence of another Delta agent on June 23, 1999, Causevic entered the room and said in a

mocking fashion, "Oh, you're watching this video because of me, right, Elise?" As Berry was leaving later that day, Causevic derisively quipped, "Bye everybody, I have to stay here because I have to watch my video now," whereupon Causevic and another employee began laughing. In addition, as Causevic was leaving the premises with his wife in August of 1999 on his last day of work, Causevic's wife called Berry a "bitch." Finally, on various occasions in June and July, several Argenbright employees (including Causevic) were rude and uncooperative towards Berry, making it difficult for her to perform her job. For example, one Argenbright employee refused to help Berry with an international air bill in front of a customer. Others (including Causevic) would not listen to Berry when she attempted to communicate with them, forcing her to write down work-related information and hand it to them. Causevic repeatedly stonewalled Berry when she sought his assistance regarding customer service or inventory by either hanging up the phone when she called him, or by walking away or simply ignoring her when she made her requests in person. At times these incidents caused Berry so much stress and embarrassment that she would break down and cry at work.

Berry complained to Blocker about these incidents on several occasions, characterizing the situation as a "hostile environment" and demanding that Blocker take steps to rectify it immediately. Nevertheless, Berry maintains that Blocker brushed off her complaints that Causevic and other Argenbright employees were giving her the "cold shoulder," telling her at various times that the situation "would pass" and that she should "just give it a week or two," and that she had to expect that type of behavior because some of the employees were friends of Causevic and didn't like that she had accused him of harassment. Berry told Blocker that she did not feel that she should have to work with Causevic, she objected that nothing was being done about the ongoing harassment. However, Causevic was never reprimanded or told to leave Berry alone. Moreover, Blocker informed Berry that someone had told him that Berry had once put her feet up on a desktop and intentionally spread her legs so men

could look down her shorts and that she had lifted up her shirt in the workplace, and he instructed Berry not to send mixed messages to the men in the warehouse.

Berry admits that the sexual component of the harassment stopped as soon as she made her original complaint to Blocker; during her deposition, she characterized the subsequent acts by Causevic and the other employees as retaliatory and not sexual, and she admitted that throughout the remainder of her employment at Delta she was never again subjected to any conduct or language of a sexually inappropriate nature by Causevic or any other employee.

On July 15, 1999, Berry filed a charge with the Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights ("IDHR") claiming that she had been subjected to a hostile work environment and retaliated against for complaining about the harassment. On August 10, the EEOC issued a right to sue letter. Approximately one month later, Berry quit her job and gave Blocker a written resignation letter which stated that her working environment was too hostile and stressful for her to bear. Less than one week before quitting, Berry filed a single-count complaint in the district court naming Delta and Argenbright as defendants. In the complaint, Berry sought relief under Title VII, claiming that Delta and Argenbright "failed to take prompt and appropriate corrective action to remedy a hostile work environment" created by Causevic's sexual harassment. The complaint did not state that Causevic or any other employee had retaliated against Berry for complaining about the harassment. On April 12, the district court dismissed all claims against Argenbright. Delta then moved for summary judgment.

The district court granted Delta's motion, reasoning that Delta was not liable for the claimed harassment which occurred prior to Berry's initial complaint to Blocker because upon learning of the harassment it "took steps reasonably likely to prevent" further harassment (i.e., Blocker and Drake convinced Causevic to change shifts, which promptly stopped him from making further propositions or sexually

suggestive comments). Moreover, the district court found that by all accounts, all gender-based harassment ceased after Berry first complained to Blocker, and that the post-complaint harassment was by Berry's admission retaliatory. The court rejected Berry's argument that this retaliatory harassment was a continued form of sexual discrimination, and since Berry neither alleged a claim of retaliation in her complaint nor argued that theory in opposition to Delta's summary judgment motion, the district court held that there was no genuine issue of material fact for trial, and dismissed Berry's claim. Berry appealed.

DISCUSSION

We review the district court's grant of summary judgment de novo, viewing all facts and drawing all reasonable inferences in the non-moving party's favor. See Spearman v. Ford Motor Co., 231 F.3d 1080, 1084 (7th Cir. 2000). Summary judgment is proper when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Summary judgment must be entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case . . . on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Title VII forbids employers from engaging in actions that "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. sec. 2000e-2(a)(1). By its terms, this provision of Title VII proscribes only workplace discrimination on the basis of sex, race, or some other status that the statute protects; it is not a "general civility code" designed to purge the workplace of all boorish or even all harassing conduct. See Spearman, 231 F.3d at 1086 (citing Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81 (1998)). Thus, in the context of a sexual discrimination charge based on a hostile work environment, "[t]he critical issue . . . is whether members of one sex are

exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." Oncale, 523 U.S. at 80 (citation omitted). Inappropriate conduct that is "inflicted regardless of sex [ ] is outside the statute's ambit," Holman v. State of Indiana, 211 F.3d 399, 403 (7th Cir. 2000), and an employer cannot be held liable for creating or condoning a hostile working environment unless the hostility is motivated by gender. See Heuer v. Weil-McLain, 203 F.3d 1021, 1024 (7th Cir. 2000). See Spearman, 231 F.3d at1085-86 (holding that employer was not liable under Title VII for sexually explicit insults directed at employee by co-employees, where the insults were meant to "express [the co-employees'] acrimony over work-related disputes" with the employee, and "not to harass him because he is a man"); Sweeney v. West, 149 F.3d 550, 555 (7th Cir. 1998). Moreover, while Title VII may impose liability on an employer for the creation or toleration of a hostile environment motivated purely by the plaintiff's filing of a complaint of sexual harassment, this is a form of retaliation rather than sexual harassment, and it must be argued as such. Heuer, 203 F.3d at 1024.

Applying these principles, it is clear that the incidents of workplace "harassment" which occurred after Berry complained to Blocker on June 7, 1999, while unfortunate, are not actionable as sexual harassment under Title VII (either collectively or individually) because Berry has presented no evidence suggesting that any of these incidents were motivated by her gender. Even taken in the light most favorable to Berry, the evidence presented suggests that all of the claimed instances of post-complaint harassment were meant as retaliation for Berry's having complained about Causevic's prior sexual harassment, and were not motivated by any anti-female animus. In her deposition, Berry testified that Causevic never sexually harassed her after she complained to Blocker, and she characterized the post-complaint harassment as "retaliatory" rather than discriminatory. Moreover, none of the claimed incidents of post-complaint harassment (considered either singly or together) support the inference that they were motivated by gender rather

than retaliation. Causevic's taunting of Berry regarding the sexual harassment video clearly seems to have been intended to insult her because she complained about Causevic, or to make light of the fact that the employees had to watch the video because of Berry's complaint. (For example, Berry claims that when she was watching the video, Causevic said "Oh, you're watching this video because of me, right, Elise?") Berry provides nothing beyond a conclusory allegation to support the inference that Causevic's statements (or the statements of other Argenbright employees regarding the video) were directed at her because she was a woman. Moreover, nothing in the record suggests that the "cold shoulder" treatment that Berry received from Causevic and other Argenbright employees after her complaint was motivated by Berry's sex. Berry has not claimed that either Causevic or any other Argenbright employee shunned her or refused to cooperate with her before she complained about Causevic, nor has she offered anything suggesting that the post-complaint hostility had a gender basis. In fact, Berry offers absolutely nothing demonstrating that any of the claimed incidents of post-complaint were motivated by Berry's sex pre se rather than by a desire to punish her for complaining about Causevic.

   As we have noted, while the creation of a hostile working environment motivated purely by the filing of a complaint might violate Title VII, it can only be actionable as retaliation--not sexual harassment--and it must be argued as such. See Heuer, 203 F.3d at 1024. While it is true that the claimed campaign of post-complaint harassment was apparently conducted in response to Berry's sexual harassment complaint, as the district court recognized, this does not impute a gender basis to the post-complaint harassment. See id. at 1022-23. Holding otherwise would force us to conclude that "every claim of retaliation for filing charges of discrimination would be a claim of discrimination, even thought Title VII makes discrimination and retaliation separate wrongs." Id. Berry did not plead retaliation in her complaint, nor did she argue a theory of retaliation to the district court in resisting Delta's motion for summaryjudgment. Therefore, her claims of retaliatory post-complaint harassment are

irrelevant to the analysis of her sexual harassment claim.

To escape this conclusion, Berry advances two arguments. First, she contends that the district court erred in granting summary judgment based on her failure to plead a claim for retaliation. She notes that Fed. R. Civ. P. 8(a) requires only that the complaint put the defendant on notice of possible claims, and not that it plead particular facts or reference each of the specific statutory provisions that might be implicated by her claim. But even if we accept the highly questionable premise that Berry's complaint successfully stated a claim for retaliation, Berry waived any such claim by failing to press it before the district court. (For reasons that are not entirely clear to us, Berry did not argue retaliation before the district court in opposition to Delta's motion for summary judgment, even though her EEOC charge in cluded a claim of retaliation, and the EEOC right to sue letter encompassed that charge as well.)

Second, Berry argues that even though the instances of post-complaint harassment were not overtly sexual, they should be considered along with Causevic's earlier, obviously sexual actions as part of a single, ongoing gender-based harassment campaign which was made possible by Delta's failure to take prompt and appropriate corrective action in response to her complaints. Berry stresses that Title VII's coverage is broad and remedial, embracing much more than patently offensive sexual behavior in the workplace. See Oncale, 523 U.S. at 80 (". . . harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex."). She notes that "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult," Meritor Savings Bank v. Vinson, 477 U.S. 57, 65 (1986), and that the determination of whether a hostile environment exists is made "in light of the record as a whole" and considering "the totality of circumstances." See id. at 69. Given this, Berry maintains that the post-complaint ostracism and other harassing conduct must be considered as part of the totality of the circumstances in determining whether she was forced to

endure an actionable hostile work environment, even if those actions were not motivated by sexual desire. See O'Rourke v. City of Providence, 235 F.3d 713, 729-30 (1st Cir. 2001) (ruling that "where a plaintiff endures harassing conduct, although not explicitly sexual in nature, which undermines her ability to succeed at her job, those acts should be considered along with overtly sexually abusive conduct in assessing a hostile work environment claim," and that "incidents of non-sexual conduct--such as work sabotage, exclusion, denial of support, and humiliation--can in context contribute to a hostile work environment."); Williams v. General Motors, Corp., 187 F.3d 553, 565-66 (6th Cir. 1999) (holding that evidence of several instances in which "the plaintiff was ostracized when others were not, combined with gender-specific epithets . . . such as 'slut' and 'fucking woman,' create an inference, sufficient to survive summary judgment, that [the plaintiff's] gender was the motivating impulse for her co-workers' behavior.").

We are not persuaded. Title VII does proscribe gender-based harassment even when it is not motivated by sexual desire, and it is true that "[c]ourts should avoid disaggregating a hostile work environment claim, dividing conduct into instances of sexually oriented conduct and instances of unequal treatment, then discounting the latter category of conduct," see O'Rourke, 235 F.3d at 730, thereby robbing instances of gender-based harassment of their cumulative effect. However, none of this helps Berry, because she offers nothing suggesting that the post-complaint harassment was motivated by her gender rather than the desire to punish her for her complaint. While the cases cited by Berry correctly stress that gender-based harassment need not be overtly sexual and may include ridicule, ostracism, and other forms of hostility motivated by an anti-female animus, they do not hold that hostile behavior by co-workers is actionable as sexual harassment even if it not based on gender. See Williams, 187 F.3d at 565 (ruling that a plaintiff must show that "but for the fact of her sex, she would not have been the object of harassment") (citation omitted). While Berry can likely show that the post-complaint harassment would not have

occurred but for her complaining of sexual harassment, this is "too remote a connection" to gender to convert the retaliatory harassment into gender-based harassment. See Heuer, 203 F.3d at 1022. Therefore, even if Delta was partly responsible for the abusive post-complaint atmosphere by not doing enough to stop it, this would not make them liable for sexual harassment.

This leaves the question of whether Delta can be held liable for any of the claimed harassment which was in fact motivated by Berry's sex (for example, the verbal and physical harassment by Causevic and other alleged acts by Argenbright employees which occurred prior to her complaint to Blocker). An employer may be held responsible for coworker on coworker harassment "only if the employer knew or should have known about [the coworker]'s acts of harassment and fails to take appropriate remedial action." McKenzie v. Illinois Dept. of Transp., 92 F.3d 473, 480 (7th Cir. 1996) (citation and internal quotation omitted). In clarifying the employer's duty, we have stated:

If an employer takes reasonable steps to discover and rectify the harassment of its employees . . . it has discharged its legal duty. An employer's response to alleged instances of employee harassment must be reasonably calculated to prevent further harassment under the particular facts and circumstances of the case at the time the allegations are made. We are not to focus solely upon whether the remedial activity ultimately succeeded, but instead should determine whether the employer's total response was reasonable under the circumstances as then existed. The reasonableness of an employer's response depends, in part, on the gravity of the harassment alleged.

Id. (citations and internal quotations omitted).

However, it is not immediately clear that this employer liability standard should apply here, because Causevic and the other Argenbright employees were contractors who were not directly employed by Delta. Hence, while Causevic and the other Argenbright employees worked with Berry, it is not clear that they were "co-workers" or "co-employee's"

for purposes of assessing Delta's liability under Title VII. Following the EEOC guideline on the subject, other circuits have ruled that an employer may be held responsible for sexual harassment based upon the acts of non-employees where the employer "knows or should have known of the conduct and fails to take immediate and appropriate corrective action." 29 C.F.R. sec. 1604.11(e) (1997); see Lockard v. Pizza Hut, Inc., 162 F.3d 1062, 1072-74 (10th Cir. 1998) (collecting cases). See also Waltman v. Int'l Paper Co., 875 F.2d 468, 479-81 (holding that there was a triable issue as to whether the employer took prompt remedial action in response to allegations of sexual harassment, some of which involved employees of an independent contractor); Barbour v. Browner, 181 F.3d 1342, 1348-49 (D.C. Cir. 1999) (assuming without expressly deciding that an employer may be held liable under Title VII for failing adequately to protect one of its employee's from harassment by employees of a contractor). To the extent that these cases provide that an employer can be held vicariously liable under Title VII for sexual harassment committed by an employee of an independent contractor (and not merely for its own negligence in addressing the problem), they would appear to be in tension with recent Supreme Court precedent, since an employee of an independent contractor typically cannot be considered an agent of the employer. See Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 754-60 (1998) (holding that an employer ordinarily is vicariously liable for the harassment perpetrated by one of its employees only to the extent provided by the law of agency); Faragher v. City of Boca Raton, 524 U.S. 775, 801-04 (1998). See also EEOC v. Indiana Bell Telephone Co., Inc., No. 99-1155, slip. op. (7th Cir. June 27, 2001). However, we need not decide what significance the vicarious-liability holdings in Ellerth and Indiana Bell have for the approach proposed by 29 C.F.R. 1604.11(e), because it is clear that Delta would prevail under either the sec. 1604.11(e) standard or under the traditional negligence standard governing an employer's liability for co-worker on co-worker harassment./2

   Read in Berry's favor, the evidence

demonstrates that Delta neither knew nor should have known of the problem before Berry complained, and that it took prompt and appropriate remedial action when she did. While it is true that Blocker was aware before June 7 that several Argenbright employees had used foul language in the warehouse, and that two female employees had complained to Blocker about two occasions in which Argenbright employees had directed inappropriate sexual language or graffiti towards them, none of these incidents involved Berry or Causevic, and the only admissible evidence of record shows that Delta addressed both of the latter complaints promptly. In addition, despite the apparent frequency of the inappropriate language used by Argenbright employees (at least some of which was sexually explicit), the evidence as a whole does not portray a workplace environment rife with gender-based harassment or hostility. Thus, none of the pre-June 7 conduct of which Delta managers were aware put Delta on constructive notice of the qualitatively different (and clearly sexually or gender motivated) harassment of Berry by Causevic, and Delta's duty to take reasonable steps to rectify the harassment was not triggered until Berry made her complaint. See Zimmerman v. Cook County Sheriff's Department, 96 F.3d 1017, 1018-19 (7th Cir. 1996).

Moreover, after Berry complained to Blocker, Delta acted promptly and appropriately to end the harassment. Blocker began his investigation immediately after Berry complained. On the very day of Berry's complaint, Blocker contacted Delta's EEO office to report the matter and to receive guidance on how to proceed. On the following day, he and an Argenbright supervisor confronted Causevic with the allegations. In an effort to corroborate Berry's complaint, Blocker promptly interviewed Torres, along with Causevic's supervisors and other Delta employees, and he interviewed Ketchum on two separate occasions shortly after Berry identified him as a witness. Torres told Blocker that she had heard Causevic ask Berry if she had thought about his "proposition," and (crediting Ketchum's version of the events over Blocker's), Ketchum told Berry "off the record" that he had witnessed Causevic sexually harass Berry,

but he refused to state this in writing. Blocker concluded that this was not enough to confirm the truth of Berry's claims. Nevertheless, within one month of starting the investigation, Blocker requested that Argenbright change Causevic's shift, and he asked Drake to require all Argenbright employees to view a sexual harassment training video which Blocker also required all Delta employees to watch. While these measures may have inspired Causevic and other Argenbright employees to perform certain retaliatory actions, they were indisputably effective in stopping Causevic's inappropriate sexual behavior. Berry argues that Delta should have taken even more aggressive measures, like separating Causevic and Berry sooner, insuring that their shifts never overlapped, ordering Causevic to leave Berry alone, and organizing employees to participate in discussion sections after watching the video. However, all that Delta was required to do in order to satisfy its obligations under Title VII was to take prompt action reasonably calculated to end the harassment and reasonably likely to prevent the conduct from recurring. The steps taken by Blocker clearly satisfied this standard. See McKenzie, 92 F.3d at 481 (finding that a defendant's response to an employee's sexual harassment complaint was reasonable where a meeting was held within ten days to discuss the complaint, after which the harasser was kept from having contact with the plaintiff, a memo was issued to all employees regarding the employer's sexual harassment policy, and the plaintiff saw the harasser only once after the meeting and heard no more harassing comments from him); Saxton v. A. T. & T. Co., 10 F.3d 526, 535-36 (7th Cir. 1993) (holding that an employer's response was both timely and reasonably likely to prevent the harassment from recurring even though it "did not meet [the plaintiff's] expectations," and affirming summaryjudgment for the employer, where the employer began an investigation the day after receiving the complaint and completed the investigation within a week, and transferred the harasser to another department within five weeks of learning that the plaintiff was not interested in transferring). Delta doubtless could have done more (for example, they could have separated Causevic and Berry immediately, and kept

them separated throughout the course of investigation), but this is irrelevant unless Berry can present some evidence suggesting that the steps that Delta actually took were not reasonably likely to prevent the harassment from recurring./3 See Saxton, 10 F.3d at 536. Berry has not done so.

Contrary to Berry's suggestion, the question of whether an employer's corrective response to sexual harassment is reasonable and adequate under the circumstances is not necessarily one for the trier of fact, and may be resolved on summary judgment where the plaintiff fails to present evidence sufficient to raise a genuine issue on the matter. See Parkins v. Civil Constructors of Illinois, Inc., 163 F.3d 1027, 1035-36 (7th Cir. 1998); McKenzie, 92 F.3d at 480-81; Saxton, 10 F.3d at 535-36. This is one such case. Berry admits that Causevic's sexual overtures definitively ceased after she complained to Blocker, and she presents no evidence demonstrating that any of the subsequent harassment was gender-based or that Delta's efforts to rectify Causevic's harassment after receiving Berry's complaint were not reasonably likely to end the harassment. Therefore, Delta discharged its duty under Title VII and is entitled to summary judgment even assuming that Causevic's pre-June 7 conduct amounted to actionable sexual harassment.

CONCLUSION

We have considered Berry's other arguments and find them meritless. For the foregoing reasons, we AFFIRM the district court's award of summary judgment.

FOOTNOTES

/1 Berry claims that, in response to her complaint, Blocker initially said, "boys will be boys." Blocker denies saying this, although he admitted that he might have said something to the effect that some of the warehouse employees acted with "immaturity." Nevertheless, it is undisputed that Blocker spent as much time discussing the matter as Berry wanted, and that he promptly investigated her claims.

/2 It is undisputed that Causevic had no supervisory authority over Berry and that he was not employed

by Delta. Therefore, it seems safe to assume that whatever standard governs Delta's potential liability for Causevic's actions, it cannot be more onerous that the negligence standard pre-scribing an employer's liability for harassment performed by one of its own employees upon a co-employee.

/3 We note, however, that the mere fact that the harassment has stopped after the employer's response does not by itself establish the reason-ableness of the measures taken in response. See Smith v. Sheahan, 189 F.3d 529, 535 (7th Cir. 1999) ("Just as an employer may escape liability even if harassment recurs despite its best ef-forts, so it can also be liable if the harassment fortuitously stops, but a jury deems its response to have fallen below the level of due care.").