

Opinions of the United
States Court of Appeals
for the Third Circuit

4-6-2006

# Clegg v. Falcon Plastics Inc

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-1826

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Clegg v. Falcon Plastics Inc" (2006). *2006 Decisions*. Paper 1296.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1296

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 05-1826

———————

BETH CLEGG,
                              Appellant

v.

FALCON PLASTICS INC; TIMOTHY
LEVERS; RICHARD NUGENT

———————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
D.C. Civil 03-cv-01562
District Judge:  The Honorable Thomas M. Hardiman

———————

Argued:  February 14, 2006

———————

Before: SCIRICA, Chief Judge, BARRY and FISHER, <u>Circuit Judges</u>

———————

(Opinion Filed: April 6, 2006)

———————

Edward A. Olds, Esq. (Argued)
1007 Mount Royal Boulevard
Pittsburgh, PA 15223

<u>Counsel for Appellant</u>

Jana P. Grimm, Esq. (Argued)
Phillip J. Binotto, Jr., Esq.
Eckert, Seamans, Cherin & Mellott
1001 Corporate Drive, Suite 200
Canonsburgh, PA 15317
        -AND-
Allan W. Brown, Esq.
Eckert, Seamans, Cherin & Mellott
600 Grant Street, 44th Floor
Pittsburgh, PA 15219

Counsel for Appellees

---

OPINION

---

BARRY, Circuit Judge

The District Court granted summary judgment or dismissals to the defendants on

Beth Clegg's Title VII hostile work environment and retaliation claims and related state

law claims. She now appeals. We have jurisdiction under 28 U.S.C. § 1291. We will

affirm in part, reverse in part, and remand for further proceedings.

**I.**

The facts, viewed in the light most favorable to Clegg,[1] are as follows. Clegg

began working for Falcon Plastics, Inc. ("Falcon") in 2001. In April 2002, she was

---

[1] In evaluating the evidence in the context of a summary judgment motion, we "take the facts in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in [her] favor." *Doe v. County of Centre*, 242 F.3d 437, 446 (3d Cir. 2001).

transferred to the Shipping & Receiving department to work as Timothy Levers' assistant. At some point prior to September 2002, Clegg and Levers began corresponding via email, often through their personal email addresses and home computers.

During the fall of 2002, Clegg was "very stressed out in terms of working," and had "absolutely no social life." (*Id*. at 164.) Levers frequently told her that she needed to "get a life," and Clegg began to think that "yeah, maybe I do need to start taking some time for myself and kicking back a little bit . . . ." (*Id*. at 165.) Shortly thereafter, Clegg sent Levers an email (from her home computer to his home computer), which read:

> Was just sitting here thinking that we can talk about our kids and sports while we're at work. Let's spice it up a little bit. Let's make it more interesting. Talk d _ _ _y to me. Have to go for now. Please respond, Lizzy

(*Id*. at 164.)

Clegg claims that she meant her statement to "Talk d_ _ _y" as a joke, and that Levers should have known it was a joke. Levers, however, did not so interpret Clegg's email, and sent her a "filthy" email in response. Clegg claims that she deleted the email and, accordingly, was unable to produce it during discovery; however, there is no dispute that Levers did, in fact, respond to her in a sexually explicit manner. Clegg also claims that Levers sent eight or nine emails following this one, asking her to respond to his email "in a graphic way." She initially sent some responses to Levers' emails (including one in which she said that his email "knocked my socks off"), but "slowly phased it out" until it finally "got to the point where I just totally eliminated responding, e-mailing[,] any

3

association whatsoever via Internet." (*Id*. at 170, 169.) When Levers mentioned the email at work, she allegedly told him that she was "totally shocked when [she] read his response," and that she "was not expecting something like that. I said that was not my intent." (*Id*. at 172, 168.)

Clegg claims that from September 2002 through January 2003, Levers subjected her to sexually harassing conduct, despite the fact that she clearly "tried to get across to leave me alone." (*Id*. at 171.) For example, over a week and one-half to two week period, Levers would come up behind her while she was sitting at her desk and rub her back and neck. He made her take evening rides around the plant in a golf cart to deliver end of the day reports. During these rides, he would touch her leg, pull her towards him, and go around turns to make her "sway over into him." (*Id*. at 186.) He would also make repeated comments to her along the lines of: "[C]ome on Beth, we would be like the Brady Bunch. We would be so good together." (*Id*. at 188.) He left a rose in her desk drawer. When she left their office to walk through the warehouse and after she left work, he would call her and ask if she missed him. He once called her at home at 1:00am, and hung up when she answered.

On January 2, 2003, Clegg received an email from Levers, which read:

> By the time you read this email I will be a thousand miles away from here. Sike, just joking. You could only wish.
> You need to run a stock status report and do the weekly billing and take the packing slips up to Phyllis ASAP. If you need any help call me at home or on my cell phone. . . . Don't be afraid to call. There's not a whole lot happening this week. You should be alright, if not i'm here for you as

4

always.  I'm here for you for anything.

How did you like that Steeler game yesterday.  Not bad uh.  We had a good time.  We missed the comeback because we left early.  I would have much rathered have taken you, but...

Have you checked your e-mail at home since Saturday night.  I wrote you an e-mail and I just need to know if you received it, read it and what you thought about it.  What are you doing for lunch today.  If you call me I can meet you somewhere for lunch.  Or maybe you need another week away from me.  And oh by the way i'll bet you look beautiful today, but i'm sure I won't be the only one to tell you that today or anyday.  I won't bother you anymore.  If you need me you know what to do.  I hope you have a great day.  Read your e-mail when you get home if you haven't already and respond.

(*Id*. at 171-72.)

Clegg spent time with Levers outside of work on at least two occasions between September and January.  On the first occasion, Clegg and Levers went out to a bar together after work.[2]  During the course of the evening, they drank and played pool.  Levers repeatedly "leaned up against" her while they were playing pool, rubbed his leg against hers while they were sitting on the bar stools, and put his hand on her outer thigh.  At the end of the evening, Levers leaned through her car window and tried to kiss her.  He asked her if she wanted to get more drinks or if she wanted him to follow her home.  Eventually, he left.

In November, Clegg again spent time with Levers outside of work.  Clegg had obtained six tickets to a Pittsburgh/West Virginia football game from Levers, was unable

---

[2] Clegg testified that she agreed to go with him because he "hounded" her to go. (*Id*. at 179.)

to find someone to use the sixth ticket, and gave the ticket to Levers. The day of the game, Clegg, her parents, her children, and Levers drove together to the game and went out to dinner after the game. Levers did not make any sexual comments or sexual advances toward Clegg, although he called her during his drive home to "touch base, say hey, hello."

On January 27, 2003, Clegg reported the sexual harassment to Richard Nugent, president and CEO of Falcon. She told him that she "did not want to be [Levers'] girlfriend" and that things were "getting way out of control." (*Id*. at 196.) She also told him about the back rubs and the emails from Levers. Nugent told Clegg that Levers did not have the authority to fire her, and told her to report any further harassment immediately. Nugent then called Levers into his office, informed him of Clegg's allegations, and advised him that sexual harassment would not be tolerated. Falcon's Human Resources Director, Angelo Morascyzk, was also present at this meeting. Levers told Nugent that "there was no sexual issues going on," and denied sending a sexually oriented email to Clegg.[3]

Over the next month, Nugent and/or Morascyzk met with Clegg at least fifteen times. Many of these meetings were at Clegg's insistence. She "was forced to repeatedly return to Nugent, questioning him why 'we are not going to have the meeting or what is going on with it.'" (*Id*. at 192-93.) On February 3, Clegg reported to Nugent that Levers

---

[3] Levers later admitted that he sent Clegg the sexually explicit email.

6

was trying to set her up to make her look bad, and doing everything he could to make her life miserable. Although Clegg concedes that the sexual advances stopped in January, when she reported them to Nugent, she claims that Levers began harassing her in other ways. He told the work crew "not to help [her] in any way, shape or form." (*Id*. at 204.) He took away work duties that she had performed well in the past. He stopped giving her information on new customers. He accused her of not giving him phone messages and "not writing down pick ups for truck loads on the pamphlets." *Id.* He stopped communicating with her, began excluding her from lunches with sales reps, and took over one of her main duties, negatively impacting her future at Falcon, at least in her view.

Clegg repeatedly complained to Nugent and Morascyzk about Levers' behavior. During at least one of her meetings with Nugent, he asked her what she wanted the company to do, and whether she wanted to be transferred to another department. Clegg said that she did not wish to be transferred. She did ask to be moved to another dock (i.e. a different work station), but this request was denied.[4]

Nugent and Morascyzk continued to speak to Levers and insisted that he begin communicating with Clegg, but Clegg did not feel that the situation was improving. On March 6, 2003, she found a tape recorder in Levers' desk. The tape in the recorder

---

[4] Falcon claims (and Clegg does not dispute) that moving her to that dock would have been impractical (because there were no phones or computers there) and ineffectual (because she still would have been reporting to Levers).

allegedly contained a recording of her telephone conversation with her lawyer.[5] Clegg reported this to Nugent, who told Clegg that it was not illegal to tape someone's conversations, and that she should return the tape recorder because taking personal property could be considered theft.

Clegg left work after this incident, and submitted a letter from her doctor to Falcon stating that she would be out on medical leave from March 10 through March 31. On March 25, Falcon sent Clegg a letter offering her a lateral transfer. On March 26, Nugent and Morascyzk met with Levers, gave him a formal written reprimand, and informed him that "any negative treatment of [Clegg] by you will be deemed retaliatory on your part and will not be tolerated. If any such retaliation or negative treatment toward Beth Clegg occurs on your part, you will [be] immediately discharged from your employment with the company." (*Id.* at 397.) Clegg did not respond to the letter offering her a transfer. She never returned to work.

Clegg filed a complaint in the United States District Court for the Western District of Pennsylvania. The complaint alleged: (1) Title VII sexual harassment and retaliation claims against Falcon; (2) a Pennsylvania Equal Rights Amendment claim against Falcon, Levers, and Nugent; (3) an invasion of privacy claim against Falcon, Levers, and Nugent; (4) a battery claim against Levers; and (5) a Pennsylvania Human Relations Act claim

---

[5] The tape containing the alleged recording of her phone conversation is either missing or the voices have been recorded over.

against Falcon.  The District Court granted dismissals or summary judgment to the defendants on all counts except the battery and invasion of privacy claims against Levers, which were dismissed without prejudice a month later.  This appeal followed.

## II.

We exercise plenary review over the District Court's decision to grant summary judgment, and must "view the facts in the light most favorable to [Clegg].  If a reasonable jury could find for her, we must reverse." *Jensen v. Potter*, 435 F.3d 444, 448 (3d Cir. 2006).

### A.    The Title VII Hostile Work Environment Claim

A plaintiff can establish a violation of Title VII by proving that discrimination based on sex created a hostile or abusive work environment. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986).[6]  Not all workplace conduct that may be described as harassment, however, rises to the level of a hostile work environment.  The harassment must be "sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment and create an abusive working environment." *Id.* at 67 (internal quotations omitted).  "The plaintiff must subjectively perceive the environment to be hostile or

---

[6] "Employer liability under the Pennsylvania Human Relations Act follows the standards set out for employer liability under Title VII." *Knabe v. Boury Corp.*, 114 F.3d 407, 410 n.5 (3d Cir. 1997) (citing *Hoy v. Angelone*, 691 A.2d 476 (Pa. Super. Ct. 1997); *West v. Philadelphia Elec. Co.*, 45 F.3d 744 (3d Cir. 1995) (utilizing Title VII standards in case involving PHRA hostile work environment claim)).  Therefore, our Title VII analysis applies equally to Clegg's PHRA claim.

9

abusive, and conditions must be such that a reasonable person would have the same perception." *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 715 (3d Cir. 1997). We use a totality of the circumstances test to determine whether the threshold level of severity and pervasiveness has been reached, and consider such factors as the severity of the harassment, the frequency of the harassment, and the degree of abuse. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).

The District Court found that there was no genuine issue of material fact as to Clegg's hostile work environment claim because Clegg "failed to set forth evidence sufficient to show that the alleged harassment was so 'severe and pervasive' as to 'alter the conditions of her employment . . . .'" (*Id*. at 14.) We find that, in coming to this conclusion, the District Court erred by failing to consider several of the allegations of sexual harassment which allegedly occurred before Clegg reported the harassment to management, and failed to consider Levers' facially-neutral conduct that occurred after she reported the sexual harassment to management (the "post-reporting conduct").

Facially neutral acts can form the basis of a Title VII hostile work environment claim, as long as they are motivated by gender-based discrimination. *See Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 148 (3d Cir. 1999), *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1485 (3d Cir. 1990). Falcon argues, however, that the post-reporting conduct should not be considered because it was not motivated by gender, but rather by Levers' anger at Clegg for reporting his prior conduct to management. *See Berry v. Delta*

10

*Airlines*, 260 F.3d 803, 809 (7th Cir. 2001) ("Title VII may impose liability on an employer for the creation or toleration of a hostile work environment motivated purely by the plaintiff's filing of a complaint of sexual harassment, [but] this is a form of retaliation rather than sexual harassment, and it must be argued as such.").  Clegg, on the other hand, argues that the post-reporting conduct was motivated by gender, *i.e.* by anger at her for rebuffing his advances.

Ultimately, the motivation behind the post-reporting conduct is a question best left to the jury to decide.  A jury could find that the post-reporting conduct was motivated by Clegg's complaint to management and, thus, to be disregarded for purposes of a sexual harassment/hostile work environment claim.  Alternatively, a jury could agree with Clegg, and find that the conduct was motivated by gender because it was related to Clegg's spurning Levers' sexual advances.

Although we believe it is a close question, Clegg has presented sufficient evidence to establish a genuine issue of material fact as to whether, considering the post-reporting conduct in conjunction with the allegations of sexual harassment that pre-dated Clegg's complaint to management, Clegg was exposed to a hostile work environment.[7]

---

[7] Falcon also contends that "Clegg cannot recover for harassment because she welcomed the conduct about which she now complains."  Appellee's Br. at 23.  "In order to constitute harassment, the conduct must be unwelcome in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive."  *Bales v. Wal-Mart Stores, Inc.*, 143 F.3d 1103, 1108 (8th Cir. 1998).  In this regard, the relevant inquiry is whether the victim "by her conduct, indicate[d] that the alleged sexual advances were unwelcome."  *Meritor Sav. Bank*, 477

11

Summary judgment would nonetheless have been appropriate if Falcon could not have been held liable, as a matter of law, for Levers' actions. An employer is generally liable for the acts of a supervisory employee whose sexual harassment of a subordinate has created a hostile work environment. When no tangible employment action has been taken against the subordinate,[8] however, an employer can avoid liability for supervisory conduct by asserting an affirmative defense showing that it "had exercised reasonable care to avoid harassment and to eliminate it when it might occur, and that the complaining employee had failed to act with like reasonable care to take advantage of the employer's safeguards and otherwise to prevent harm that could have been avoided." *Faragher v. City of Boca Raton*, 524 U.S. 775, 805 (1998); *see also Burlington Industries, Inc. v.*

---

U.S. at 68. Falcon points to Clegg's email to Levers asking him to talk dirty to her as evidence that Clegg indicated, by her conduct, that Levers' advances were welcome. Clegg claims that her email to Levers was intended as a joke. We believe that "[t]he inherently subjective question of whether particular conduct was indeed unwelcome presents difficult problems of proof and turns primarily on credibility determinations which are inappropriate for summary judgment." *Morton v. Ford*, 162 F. Supp. 2d 1228, 1239 (D. Kan. 2001). While Clegg's conduct may raise a question as to whether Levers' conduct was unwelcome, it does not prove as a matter of law that Clegg invited what allegedly followed. Whether what followed was unwelcome should be determined by a jury after assessing the evidence and the credibility of the witnesses.

[8] The Supreme Court has defined a tangible employment action as "a significant change in employment status," often, but not always, resulting in economic injury. *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761-62 (1998); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 808 (1998). "A tangible employment action [is] also defined by reference to a non-exclusive list of possible actions: 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Suders v. Easton*, 325 F.3d 432, 434 (3d Cir. 2003) (quoting *Ellerth*, 524 U.S. at 761).

*Ellerth*, 524 U.S. 742 (1998). Because no tangible employment action was taken against Clegg, this affirmative defense–known as the *Faragher/Ellerth* defense–is potentially available to Falcon.

We cannot say, as a matter of law, that Falcon prevailed on its affirmative defense. Reasonableness is a paradigm question of fact, and material facts are in dispute. That Falcon immediately informed Levers of its policy against harassment, met with Levers and Clegg often, and offered to transfer Clegg to another department provides evidence that Falcon acted reasonably to avoid further harassment. But Clegg asserts that Falcon only acted at her repeated insistence. She further contends that Nugent eventually appeared "annoyed" with the situation and "would go the other way" when he saw her coming. (App. at 196-97, 203.) And when Clegg complained that Levers had been taping her conversations, Nugent "cussed" at her, questioned her job performance, and stated that both she and Levers should be fired. (*Id*. at 141, 206-07.) In light of these facts, a jury could determine Falcon did not act with sufficient diligence to avoid further harassment.

As for Clegg, she waited approximately four months before reporting Levers' offensive conduct, and, we note, did not report much of the conduct that she later alleged in her complaint and her deposition. A delay in reporting may support a finding that an employee failed to take advantage of safeguards. *See Cardenas v. Massey*, 269 F.3d 251, 267 (3d Cir. 2001). In *Cardenas*, however, we ultimately found that the plaintiff's

13

significant delay in reporting the harassment was not necessarily unreasonable.

*Cardenas*, 269 F.3d at 267 ("In these circumstances, Cardenas' reluctance to file a formal complaint for fear of aggravating the situation or branding himself a troublemaker might not have been unreasonable."). Here, as in *Cardenas*, the reasonableness of the delay in reporting is a question of fact for a jury to decide.

Clegg's refusal to accept a lateral transfer to another position (with similar pay and responsibilities) is also potential evidence of her failure to take advantage of safeguards or to otherwise prevent harm that could have been avoided. *See Cardenas*, 269 F.3d at 267. A jury could determine, however, that a victimized employee should not be forced to transfer to another position, and that a refusal to do so under the facts of the case was not unreasonable.

Accordingly, the grant of summary judgment on Clegg's hostile work environment claim will be reversed.

## B. The Title VII Retaliation Claim

To establish retaliation under Title VII, Clegg must show that:

> "(1) she engaged in activity protected by Title VII; (2) [Falcon] took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action."

*Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1299 (3d Cir. 1997) (quoting *Nelson v. Upsala College*, 51 F.3d 383, 386 (3d Cir. 1995)). Falcon argues, and the District Court found, that Clegg "failed to present evidence sufficient to establish an adverse

14

employment action." (*Id.* at 15.)  We agree and, indeed, have already found that no tangible employment action was taken against Clegg, much less one that was "adverse.".

A constructive discharge can count as an adverse employment action for retaliation purposes.  *See Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 156 & n.11 (3d Cir. 1999).  Moreover, "harassment that is severe or pervasive enough to create a hostile work environment" can count as the requisite adverse employment action.  *Jensen v. Potter*, 435 F.3d at 449.  Clegg has established neither.

To find constructive discharge, we "need merely find that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign."  *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 888 (3d Cir. 1984).  In other words, Clegg was required to show that the discrimination she alleges surpassed a "threshold of intolerable conditions."  *Duffy v. Paper Magic Group, Inc.*, 265 F.3d 163, 169 (3d Cir. 2001) (internal quotations omitted).  "Intolerability . . . is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt compelled to resign–that is, whether [she] would have had no choice but to resign."  *Connors v. Chrysler Financial Corp.*, 160 F.3d 971, 976 (3d Cir. 1998) (internal citations omitted).

The conduct alleged by Clegg would not compel a reasonable person to resign.  "[We] note that [Clegg] cannot rely on many of the factors commonly cited by employees who claim to have been constructively discharged. [Clegg] was never threatened with

15

discharge;[9] nor did her employer ever urge or suggest that she resign or retire. . . .

Similarly, [Clegg's] employer did not demote her or reduce her pay or benefits. [Clegg] was not involuntarily transferred to a less desirable position . . . .  She was not even given unsatisfactory job evaluations . . . ." *Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1161-62 (3d Cir. 1993).  Furthermore, Clegg refused Falcon's offer to transfer to another position and "never advised [her employer] that she would feel compelled to leave if changes [in her circumstances] were not made." *Id.*  In *Clowes*, we noted that "a reasonable employee will usually explore such alternative avenues thoroughly before coming to the conclusion that resignation is the only option." *Clowes*, 991 F.2d at 1162.

Nor was the alleged retaliatory harassment – the post-reporting conduct – sufficiently severe and pervasive to establish an adverse employment action.  In *Jensen*, where we first recognized the possibility that retaliatory harassment could constitute an adverse employment action, we explained that such harassment has to be so severe and pervasive that it creates a hostile work environment. *Jensen*, 435 F.3d at 449.  Put simply, the post-reporting conduct alleged by Clegg does not rise to this level. Accordingly, the District Court's grant of summary judgment to Falcon on Clegg's retaliation claim will be affirmed.

---

[9] Clegg did testify that Nugent once threatened to terminate her, but it does not appear that she took this as a serious threat, and she does not rely on it to support her constructive discharge claim.

16

## C.    The Intrusion Upon Seclusion Claim

Clegg claims that her seclusion was intruded upon when Levers secretly tape recorded her private conversation. To maintain an intrusion upon seclusion claim under Pennsylvania law, a plaintiff must show that (1) there was an intentional intrusion; (2) upon the solitude or seclusion of the plaintiff, or his or her private affairs or concerns; and (3) that the intrusion was substantial; and (4) highly offensive to the ordinary reasonable person. *See Larsen v. Philadelphia Newspapers, Inc.*, 543 A.2d 1181, 1186-87 (Pa. Super. Ct. 1988).[10]

Summary judgment for Falcon and Nugent was appropriate because Falcon and Nugent were not vicariously liable for Levers' conduct. Under the doctrine of respondeat superior, an employer can only be held liable for the conduct of a employee if the employee was acting within the scope of his or her employment. "For an act to be within the scope of employment it must: 1) be the kind the actor was employed to perform; 2) occur substantially within the authorized time and space limits and 3) it must be actuated, at least in part, by a desire to serve the master." *Tucker v. Merck & Co.*, 2003 U.S. Dist. LEXIS 7672, at *39-40 (E.D. Pa. 2003) (citing *Shuman Estate v. Weber*, 419 A.2d 169, 173 (Pa. Super. Ct. 1980)). Levers' taping of Clegg's conversation was certainly not the

_____

[10] The District Court granted summary judgment to Falcon and Nugent on Clegg's intrusion upon seclusion claim and subsequently dismissed the claim against Levers without prejudice so that Clegg could pursue it in state court. Clegg does not challenge the dismissal on appeal.

17

kind of act that he was employed to perform, nor can it realistically be argued that he was motivated by a desire to serve Falcon. Thus, his action was outside the scope of his employment and Falcon cannot be held vicariously liable.

Clegg argues that "the acts of an agent can be ratified by inaction which manifests consent," and that "a jury could draw the inference from the evidence that Nugent either approved or at least ratified Levers' conduct" when he initially told her that it was not illegal to tape someone's conversations and that her taking the tape recorder could be considered theft. This argument is undermined by the fact that Nugent clearly expressed to Clegg that the company did not give anybody permission to record her, and Levers was given a "formal written reprimand" for taping the conversation.[11] Given these undisputed facts, no reasonable jury could conclude that Nugent or Falcon approved or ratified any taping of Clegg's phone conversation. Summary judgment was, therefore, appropriate.

### III.

We will affirm that part of the District Court's order granting summary judgment and/or dismissals to defendants on Clegg's Title VII retaliation claim, Pennsylvania Equal

---

[11] Levers received a letter, which stated:
> [Falcon] cannot and will not tolerate or condone the tape recording of an employees (sic) conversation, without his or her prior consent and approval. . . . The tape recording of an employee's conversation without the employee's consent is considered a serious act of misconduct . . . . Any further actions of this nature will result in your immediate termination from the Company.

(*Id*. at 328.)

18

Rights Amendment claim,[12] and intrusion upon seclusion claim against Nugent and Falcon.  We will reverse, however, with respect to her Title VII hostile work environment claim and Pennsylvania Human Relations Act claim, and remand for further proceedings consistent with this opinion.

---

[12] Clegg has not challenged on appeal the dismissal of her claim under the Pennsylvania Equal Rights Amendment.