RIPPLE, Circuit Judge,
dissenting.
This case presents many close questions of fact assessment and therefore presents a jury question. Accordingly, I would reverse the judgment of the district court and remand the case for further proceedings.[1]
It is well-established that an employer is liable for a hostile work environment created by an employee when the employer does not respond promptly and adequately to employee harassment. Sutherland v. *391 Wal-Mart Stores, Inc., 632 F.3d 990, 994 (7th Cir.2011); Porter v. Erie Foods Int’l, Inc., 576 F.3d 629, 636 (7th Cir.2009). Just as the severity and the pervasiveness of harassment must be assessed in light of all the circumstances, see Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), the assessment of whether a response to that harassment has been prompt and adequate must take into account all the facts and circumstances, see Berry v. Delta Airlines, Inc., 260 F.3d 803, 811 (7th Cir.2001) (noting that we must “ ‘determine whether the employer’s total response was reasonable under the circumstances as then existed’ ”) (quoting McKenzie v. Illinois Dep’t of Transp., 92 F.3d 473, 480 (7th Cir.1996)).
The majority opinion suggests that the response in the present case can be justified because it is “on par” with responses determined to be prompt and adequate in other circumstances. Majority Op. at 384. But simply utilizing remedial tools found adequate in other circumstances hardly establishes that those tools were adequate for the present case. Nor does it establish that those tools were implemented with sufficient skill and sensitivity to constitute an adequate remedy in the situation at hand. Although “[w]e do not ignore hindsight, ... the ultimate question is whether the [employer’s] response was likely to succeed ex ante.” Sutherland, 632 F.3d at 995; see also Porter, 576 F.3d at 637; Berry, 260 F.3d at 811. The basic purpose of the remedy is to permit an employee to get on with the business of making a living without the extraneous, and illegal, interference of the harassing activity. The absence of another attack by a predator is no “solution” if the employer’s remedy nevertheless leaves the victim in substantial and reasonable fear of another imminent strike. See Smith v. Sheahan, 189 F.3d 529, 535 (7th Cir.1999) (“Just as an employer may escape liability even if harassment recurs despite its best efforts, so it can also be liable if the harassment fortuitously stops, but a jury deems its response to have fallen below the level of due care.”); see also Berry, 260 F.3d at 813 n. 3 (same).
Actionable sexual harassment occurs when, under all the circumstances, the actions of the harasser are so severe or pervasive as to change the victim’s terms and conditions of employment. Oncale, 523 U.S. at 81, 118 S.Ct. 998. In this case, among those facts and circumstances is the plaintiffs status as a student worker whose terms and conditions of employment most certainly included the need for a work environment compatible with his status as a first-year, indeed, first-semester, college student in the academic department where he worked. An institution of higher learning assumes special responsibilities for all students, but especially undergraduate students, who undertake such a formative educational experience within its walls. A breach of that trust, even in a work environment, can have dire consequences to a neophyte in the halls of higher education. If sexual harassment occurs, and especially if the perpetrator is a faculty member, the University has a responsibility to implement a remedy that restores the victim’s ability to work comfortably and effectively as a student worker.
On this record, a jury well might conclude that the implemented discipline of a letter of reprimand that forbade further contact between the alleged perpetrator and student workers was an ineffective response to the situation confronting the student-worker victim and, under the circumstances, presented little hope of restoring the victim to the terms and conditions of employment that he had a right to *392 expect. In making this assessment, the jury would have the right to assess the alleged perpetrator’s earlier history of untoward conduct, a history that had persisted despite an earlier letter of reprimand,[2] an earlier encounter with another student[3] and numerous other informal complaints by staff members.[4] The jury reasonably could conclude that the situation was not going to be cured by yet another letter of reprimand. The jury might conclude that the student worker, upon his arrival at the University, found himself in a situation in which an atmosphere of sexual harassment already was prevalent and with respect to which the University had adopted, negligently or consciously, a de facto policy of laissez-faire. Given these circumstances, the jury well might decide that the decision to issue yet another letter of reprimand constituted nothing more than an effort to maintain the status quo while placating the victim and his family. It might well determine that the University was obliged to act earlier and with more stringent measures.[5] After all, the reme *393 dy chosen by the University left the perpetrator on the scene, free to prowl the department in search of the individual who had caused the disciplinary action. Few first-semester college students tackle first-year chemistry courses in this ambiance.
The University’s follow-up response of an order barring the alleged perpetrator from the campus might convince the jury that the University’s response was indeed adequate. On the other hand, the jury might determine that this second course of action was too-little-too-late or that the enforcement of the bar was half-hearted or negligently lax. The evidence of record would support either view and therefore presents a jury question.
Finally, in determining the adequacy of the remedy, the jury was not obliged to ignore the plaintiff’s account of the effect that the University’s alleged failure to respond adequately had on his future at the University. According to the plaintiffs testimony, which we must accept as true as long as the case is in summary judgment posture, the prospect of encountering the alleged perpetrator in the building was a prime cause in his shift of focus from a pre-medical concentration to another discipline. The jury might well determine that the student worker’s account of the effect of this non-enforcement on his academic well-being was not as significant as he states and that intervening factors were the true cause in the alteration in his work and academic plans. On the other hand, the jury might determine that the plaintiffs second-semester decision-making was indeed caused by the alleged harassment and alleged lethargic implementation of a remedy. The jury might conclude that, given the plaintiffs age, education, experience and his student worker status, the response of the University was indeed negligent.
It is undisputed that the University acted; indeed, in some employment situations, its action may have been adequate. It is questionable, however, whether, in Mr. Milligan’s particular situation, the University’s action was a reasonable one. In assessing this question, the jury could consider the surrounding circumstances to determine whether the remedy was inadequate or whether its implementation was half-hearted. The cold record on summary judgment yields no definitive answer to this question, but a reasonable juror could construe the facts in such a way as to reach a conclusion supportive of the plaintiffs position.
The majority fears that this analysis “threaten[s] to carve a higher standard of protection for student workers than for other plaintiffs,” a result that is unwarranted, among other reasons, because student workers are not so unusual in terms of the power imbalance that they face with their employers. Majority Op. at 387. I certainly agree that an imbalance of power is at the heart of “[m]any if not most harassment cases.” Id. The situation of a student worker is unique not solely because of the student’s characteristic vulnerability; it is unique because it is a part of a larger, special relationship between an institution of higher learning and an individual. In that relationship, the institution is entrusted with responsibilities for care of the student different from, and far in excess of, what an employer is expected to provide for an employee. See supra pp. 391-92. More importantly, however, my approach is hardly a new or radical statement of the standard to be applied and *394 certainly recognizes no new category of protection for students or any other group in the abstract. Current law unequivocally instructs that we account for the particular circumstances of an individual employment relationship in assessing the reasonableness of an employer’s response. It is a significant miseharacterization of my position to suggest that I propose some sort of heightened standard of protection for student workers. I simply suggest that Mr. Milligan’s student-worker status must be included among the totality of the circumstances a jury would consider in the present case. The considerations I have outlined above simply highlight the particular facts of this case which might convince a jury, in applying current law, to conclude that SIU failed to meet its obligations with respect to Mr. Milligan.
Because the record is not free of material factual issues regarding the adequacy of the University’s response, I would reverse the judgment of the district court and remand the case for trial. Accordingly, I respectfully dissent.

. Since my colleagues in the majority have pretermitted any discussion of the other requirements of a sexual harassment claim, I shall not elaborate on the merits of these elements. Suffice it to say that, upon examination of the record and the relevant case law, I am convinced, as my colleagues assume, that the other elements have been met. I note that the record in this case supports Mr. Milligan's theory that he was the object of the behavior in question because the perpetrator regarded him as not possessing the physical attributes usually attributed to someone of the male sex. Price Waterhouse v. Hopkins, 490 U.S. 228, 250-52, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion) (woman harassed because she was perceived as being not sufficiently feminine), superseded in part by statute, Civil Rights Act of 1991, Pub.L. No. 102-166, 105 Stat. 1074.

. R.40-5 at 11 (Koropchak Dep. 39-40).

. Id. at 12 (Koropchak Dep. 42-45).

. R.40-4 at 16-17 (Kraft Dep. 61-64); R.40-7 at 7 (Kinsel Dep. 23). The majority claims that we ought not consider these incidents in determining whether SIU's response was adequate. It does so by quoting a statement in Mr. Milligan’s brief that he was "the only person who complained of sexual harassment by Dr. Meyers.” Appellant’s Br. 12. That statement was made in the context of Mr. Milligan’s effort to respond to the district court's view that Meyers was an "equal opportunity” harasser. There can be no question that Mr. Milligan raised adequately the argument that the University’s response to Meyers’s attacks was inadequate, and the record makes crystal clear that in the period between the first letter of reprimand in 1995 and the letter now in question, Meyers persisted in his untoward conduct toward University employees and students.
The record unequivocally demonstrates that the 1995 letter of reprimand did not quash Meyers’s bad behavior. Koropchak’s deposition says that, when the 2007 Milligan complaints came in, Koropchak received correspondence from the Dean of Science noting that the Dean himself had, at some unspecified time, "personally observed Dr. Meyers casually touching female members of [the Dean's] staff” and it made the staff "feel uncomfortable.” R.40-5 at 11 (Koropchak Dep. 38). Koropchak described the correspondence as “additional evidence that was suggestive of [an ongoing] pattern.” Id. (Koropchak Dep. 39) (emphasis added). In their depositions, Kraft and Kinsel also mention incidents involving other staff members, none of which resulted in a formal complaint, without detailing when the behavior took place — although it was clearly before 2007 when Mr. Milligan complained. R.40-4 at 17 (Kraft Dep. 62); R.40-7 at 6-7 (Kinsel Dep. 18-23). Drawing reasonable inferences in Mr. Milligan’s favor, there is certainly evidence from which a jury could have concluded that Meyers's conduct was part of a pattern known to SIU officials and not sufficiently corrected by prior disciplinary attempts.

.The majority acknowledges that "the record supports the notion that Kinsel and Koropchak attempted to discourage Milligan from pursuing the matter because it would embarrass and harm an important member of the university community.” Majority Op. at 384. Nevertheless, the majority is persuaded that SIU’s response is adequate, as a matter of law, based on two other surrounding facts. First, two university employees, one in the Affirmative Action Office and one an ombudsman, encouraged the Milligans in the complaint process on one occasion and checked in with Koropchak after the investigation had started to determine its progress. See id. at 384-85. Second, although they required repeated assurances that Mr. Milligan wished to proceed, Kinsel and Koropchak subsequently offered responses that "were otherwise reasonable and effective.” Id. (emphasis added). The point remains that the most senior and important University officials with whom Mr. Milligan dealt throughout his ordeal discouraged his going forward with the complaint. While the ultimate question is whether the total response was reasonable under the circumstances, see Berry v. Delta Airlines, Inc., *393 260 F.3d 803, 811 (7th Cir.2001), the jury certainly had the right to assess whether the efforts of these University officials contributed to the inadequacy of the response.